**CENTEX CORPORATION,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 96–494C.**

United States Court of Federal Claims.

May 31, 2002.

Melvin C. Garbow, Washington, D.C., for plaintiffs. With him on the briefs were Kent A. Yalowitz, Mark W. Stoutenburg, Pamela A. Miller, Jeanne A. Fugate, Howard N. Cayne, Thomas R. Dwyer, and Michael A. Johnson, of counsel.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Scott D. Austin, Glenn I. Chernigoff, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, of counsel.

*OPINION*

BRUGGINK, Judge.

Pending in this *Winstar* [1] related contract action is defendant United States' motion to dismiss the "parent" plaintiff, Centex Corporation, for lack of standing. Oral argument was held May 15, 2002. For the reasons set out below, the motion is denied.

## BACKGROUND

A more detailed version of the background facts giving rise to this litigation can be found in *Centex Corp. v. United States ("Centex I")*, 48 Fed.Cl. 625 (2001), and *Centex Corp. v. United States ("Centex II")*, 49 Fed.Cl. 691 (2001). Familiarity with the facts is presumed. For the purposes of deciding this motion, we focus on the following facts.

As part of their efforts to minimize government exposure to liability in connection with disposing of failing federally-insured banks, the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"), sought to market as a package a group of banks under the name of the "Southwest Plan." As explained in *Centex I* and *Centex II,* the opportunity to utilize built-in losses of the failed banks as a way of sheltering income from taxes was a primary marketing tool used by the regulators. Centex Corporation, which was not in the banking business, was interested in purchasing banking assets in order to shelter its own income.[2]

Centex Corporation has a wholly-owned second-tier subsidiary, Centex Real Estate Corporation ("CREC"). CREC, in turn, has a wholly-owned subsidiary, CTX Holding Company ("CTX"). As part of their successful bid to buy the Southwest Plan banks, Centex, CREC, and CTX applied to FHLBB for approval of the organization of Texas Trust Savings Bank, FSB ("Texas Trust"). CTX, which was created contemporaneously with this transaction, was to be the sole shareholder of Texas Trust. The organization of Texas Trust was approved by FHLBB on December 29, 1988, by resolution.

The resolution accomplished a number of other things. One was the approval of the acquisition by Texas Trust of the assets of the defunct banks in the Southwest Plan. The resolution was conditioned upon the execution of an assistance agreement between FSLIC and CTX. On that same day, Texas Trust came into existence and executed separate agreements with FSLIC acquiring the assets and assuming the liabilities of four insolvent Texas savings and loan associations: Peoples Savings and Loan Association, Ranchers Savings Association, Lee Savings Association, and Burnet Savings and Loan Association.

Also on December 29, representatives from CTX, Texas Trust, and FSLIC executed and signed an Assistance Agreement (the "Agreement"). However, no representative from Centex signed it. Section 27(a) of the Agreement, entitled "Entire Agreement, Severability," states:

> This Agreement and the other agreements entered into by [Texas Trust] pursuant hereto, together with any interpretation or understanding agreed to in writing by the parties supersede all prior agreements and understandings of the parties in connection with them, excepting only the Acquisition Agreements and any resolutions or letters concerning the Transaction or this Agreement issued by [FHLBB] or [FSLIC] in connection with the approval of the Transaction and this Agreement, *provided*, however, that in the event of any conflict, variance or inconsistency between this Agreement and the Acquisition Agreements or any other agreement entered into by [Texas Trust] in connection with the Transaction, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations and liabilities of [FSLIC] are concerned.

Assistance Agreement § 27(a).

Also on December 29, CTX and Texas Trust entered into a "Capital Maintenance

---

**1.** *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

**2.** In their marketing of the assets to entities such as Centex, FHLBB and FSLIC made it clear that FSLIC expected to share in the anticipated tax benefits.

Agreement" with FSLIC and assumed the responsibility to maintain Texas Trust's regulatory capital. Representatives from CTX, Texas Trust, and FSLIC signed the Capital Maintenance Agreement. No representative from Centex did.

The negotiations leading to the execution of the resolution and these agreements, however, were conducted between the government and Centex employees.[3] For example, the "Term Sheet" setting out the precise proposal for acquisition came from Centex, which was plainly understood to be the ultimate acquirer, although acting through a not-yet-created banking subsidiary. In the term sheet, Centex offered to infuse capital into Texas Trust.

Despite the necessity to establish a separate entity to enter into the banking business and take over the defunct banks' assets, throughout the negotiations leading to the agreements, both sides built the transaction around Centex's ability to utilize the tax benefits, thereby creating value which could be shared with FSLIC. An internal FHLBB memorandum, for example, states:

> The Williamson proposal provides for 70% [tax sharing] to FSLIC and 30% to the acquirer. *Centex* proposes 25% and 75% to the acquirer. The argument they make is that they are a tax payer and FSLIC can look forward to substantial benefits from them, whereas some other acquirers who are willing to give substantial percentages to FSLIC are unlikely to be able to utilize the existing tax benefits.

Mem. from Leo B. Blaber, Jr., FHLBB, to Tom Lykos, Director for Southwest Plan, and Rob Ross, Assistant Director for Southwest Plan (Dec. 6, 1988) at 1 (emphasis added).

Similarly, Centex CFO David Quinn stated that "[t]he government emphasized ... that they were looking for potential acquirors who had adequate taxable earnings with which to fully utilize the available tax benefits-and thus share those benefits with the government." Decl. of David W. Quinn ¶ 6 (Dec. 23, 1999). Furthermore, Quinn stated that:

[G]overnment representatives on numerous occasions required Centex management to explain how Centex would be able to fully utilize the tax benefits because the government's share of such benefits was critical to their analysis as to whether the Centex transaction was more favorable compared to a liquidation of the LAMB package thrifts.

*Id.* ¶ 11. He also stated that:

> [T]he critical input that [FSLIC] had is that we had to be able to prove we could use the tax benefits because in order for them to end up with a more cost-efficient transaction versus liquidation, we had to be able to support the fact that we could actually realize the tax benefits and therefore they could realize the tax savings. And so ... I don't know how it was cast, but we ought to rethink the tax sharing laid out here at 75/25.
>
> . . . .
>
> ... [Representatives of FSLIC and FHLBB] were clearly of the opinion that somebody who could utilize those tax benefits would be able to pay more money for a troubled thrift than somebody who could not . . . .

Dep. of David W. Quinn at 61, 127.

Centex General Counsel Raymond Smerge testified that FHLBB Chairman Wall represented to Centex that FHLBB "wanted people like Centex who could use those tax benefits." Dep. of Raymond Smerge at 36. In a memorandum to FHLBB Chairman Wall and two FHLBB Board Members, Leo Blaber, a FHLBB negotiator, noted that one assumption of the deal was the maximization of tax benefits. Mem. from Leo B. Blaber, Jr., FHLBB, to M. Danny Wall, Chairman, FHLBB, Roger F. Martin, FHLBB Board Member, and Lawrence J. White, FHLBB Board Member (Dec. 16, 1988) at 1. This maximization could only have occurred through their utilization by the Centex Consolidated Group, which had the necessary income to offset with losses. The government's final costing memorandum, for example, noted that "FHLB of Chicago" would "assume" that Centex would have "enough

---

**3.** Indeed, Texas Trust did not come into existence until the day the Agreement was executed.

taxable income to use all the tax benefits that are generated from operating and built-in losses" and observed that:

> According to their most recent annual report, Centex had taxable income of approximately $86 million in 1986, $77 million in 1987, and $36 million in 1988. The amount of tax benefits returned to the FSLIC in the future depends entirely on Centex's ability to utilize these tax saving[s]. To determine the value of the tax benefits, AED assumed that Centex would continue to have taxable income of $75 million for the next 8 years.

Mem. from Joseph Blalock & Margaret Hawley, Financial Analysts, AED, to Thomas Lykos, Deputy Executive Director, Southwest Plan, FSLIC (Jan. 14, 1989) at 3.

Centex intended to utilize the tax benefits as the parent of the Centex Consolidated Group. In his declaration, CFO Quinn stated that:

> One very important piece of our thinking in regard to such an acquisition was the opportunity to reduce income taxes on the earnings of Centex.
>
> ... I believed that Centex had a competitive advantage over many other potential buyers of such institutions because of the availability of tax benefits, which Centex could use to reduce its tax burden from earnings of other businesses.... Based on the availability of substantial tax benefits offered by the government, I also concluded that Centex should be prepared to pay a substantial premium for the assets of an insolvent FSLIC-insured institution.
>
> . . . .
>
> As is reflected in the board presentation, the economics of the transaction depended on the tax benefits to justify the price Centex paid-it would have been insanity to close without them .... The economics of the tax benefits were important to the deal, and we explained them in detail to the board.
>
> . . . .
>
> ... Centex simply would not have entered into the transaction had it believed that the tax benefits were not a major part

of the value it was receiving from the government.

Quinn Decl. ¶¶ 3–4, 14, 19.

As we have said on other occasions in connection with these tax-benefit *Winstar* cases, it is clear that the tax benefits formed a part of the consideration that the government delivered upon closing. FHLBB Chairman Wall stated, in testimony before Congress at various times, that:

> [T]ax benefits are merely one form of compensation to an acquirer. If tax benefits were not part of the package, the FSLIC would have had to increase other payments to the acquirers to compensate them for accepting the "bad" assets already on the books of the insolvent institutions. *Problems of the FSLIC: Hearings Before the Senate Comm. on Banking, Housing, and Urban Affairs,* 101st Cong. 276 (1989).
>
> These tax benefits are, in essence, an additional asset that the FSLIC can provide as part of a transaction. To the extent that tax benefit[s] are part of the package, the FSLIC can reduce its other payments to the acquirer.... if these tax benefits were not available, the FSLIC would have to make commensurately larger direct payments in some other form. *FSLIC Assistance Programs: Hearing Before the House Comm. on Banking, Finance and Urban Affairs,* 101st Cong. 138–39 (1989).
>
> Tax benefits are an additional asset inherent in a transaction that can make the target thrift more attractive to an acquirer and thereby reduce the assistance that must be offered by the FSLIC to induce its acquisition. *Budget Implications and Current Tax Rules Relating to Troubled Savings and Loan Institutions: Hearings Before the House Comm. on Ways and Means,* 101st Cong. 171 (1989).

On the same day that the Assistance Agreement was executed, the IRS issued Centex a private letter ruling regarding certain tax consequences of the acquisitions. The letter of request came from Centex and indicated that it was the acquiring entity, albeit through its subsidiaries. Centex represented that the new entity "will join in filing a consolidated federal income tax return with Centex." Letter from James T.

O'Hara to Jamie Dahlberg, Associate Chief Counsel, Internal Revenue Service (Nov. 23, 1988) at 4.

During the relevant years, Centex filed its federal income tax returns pursuant to Internal Revenue Code section 1502 as the parent of a Consolidated Group. It deducted covered asset losses attributable to Texas Trust on its returns. Losses attributable to the subsidiary bank were consolidated at the holding company level. During those years, FSLIC and the Federal Deposit Insurance Corporation audited Centex to ensure that it was sharing whatever tax benefit items it had taken advantage of pursuant to the terms of the Agreement. Under applicable law, a Consolidated Group must continue to file as a group unless granted permission to deconsolidate its returns. The parent of the Consolidated Group must include each of its subsidiaries in the group's filings.[4]

## DISCUSSION

Centex is ultimately the owner of the signatory plaintiffs. Plaintiffs do not contend, however, that Centex's status as shareholder gives it standing. Instead, plaintiffs offer four ways of viewing the circumstances giving rise to the Agreement under which Centex retains standing. Their primary contention is that, although Centex is not a signatory to the Agreement, it was a party to it. Second, they contend that a separate, implied-in-fact contract arose between the United States and, among others, Centex, and that the Agreement was only one element of this contract. Third, they argue that Centex, even if not directly in privity with the United States, was a third party beneficiary to the Agreement. Finally, they contend that CTX and Texas Trust were disclosed principals for Centex in negotiat-

ing the Agreement, and that Centex can thus enforce the Agreement.

Defendant contests each of these theories. For the reasons set out below, we find it unnecessary to address the plaintiffs' last two contentions, as we conclude that Centex was a party to the Agreement under either or both of its first two theories.

■ It is well settled that "[o]nly plaintiffs who are in privity of contract with the government can have standing to bring a claim in this court." *Pacetti v. United States*, 50 Fed.Cl. 239, 244 (2001). Nevertheless, plaintiffs are correct that Centex does not have to be a signatory to the Agreement to be a party to it. *See, e.g., Tri–Cities Newspapers, Inc. v. Tri–Cities Printing Pressmen and Assistants' Local 349*, 427 F.2d 325, 327 (5th Cir.1970) ("[I]t is incumbent on our courts to examine not only the face of the contract, but to look beyond it to other facts which would indicate who were the parties to the contract."); *Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995) ("When the parties to a contract set forth the terms of their agreement in writing and manifest in some manner a clear intent to be bound, the absence of one party's signature on the written agreement will not defeat or invalidate the contract.").

■ What are the indications that Centex was a party to the Agreement? We begin with one obvious indication that it was not a party: the preamble, which refers to CTX, Texas Trust, and FSLIC, but does not include Centex. Moreover, section 30 of the Agreement, the "sole benefit" clause, states that the sole benefit of the Agreement runs to the parties:

It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are

---

4. C.F.R. section 1.1502–75(a)(2) states:
   A group which filed (or was required to file) a consolidated return for the immediately preceding taxable year is required to file a consolidated return for the taxable year unless it has an election to discontinue filing consolidated returns under paragraph (c) of this section. 26 C.F.R. § 1.1502–75(a)(2) (1993). C.F.R. section 1.1502–75(h)(2) states:
   If, under the provisions of paragraph (a)(1) of this section, a group wishes to exercise its

privilege of filing a consolidated return, then a Form 1122 must be executed by each subsidiary and must be attached to the consolidated return for such year. Form 1122 shall not be required for a taxable year if a consolidated return was filed (or was required to be filed) by the group for the immediately preceding taxable year.
26 C.F.R. § 1.1502–75(h)(2).

for the sole benefit of the parties hereto and for the Bank and its transferees, successors and assigns as security for indebtedness of [Texas Trust] to the Bank and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto and the Bank and its transferees, successors and assigns any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

Assistance Agreement § 30.

There are, however, provisions of the contract which indirectly, but clearly, reference Centex. Section 18(c) of the Agreement, for example, states:

[Texas Trust] shall file its tax returns, including the filing of consolidated or separate returns, in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance from [FSLIC] under this Agreement . . . .

*Id.* § 18(c). Texas Trust could not file a consolidated return on its own. That would have required the cooperation of Centex, which was the parent of the Consolidated Group.

The government suggests that this language imposed an obligation on CTX and Texas Trust to maximize tax benefits only *after* Centex had earlier made an election to file consolidated or separate returns. The clause, "including the filing of consolidated or separate returns," in other words, did not define the obligation. This reading is, on its face, illogical and grammatically incorrect.

A more natural reading is that, at a minimum, CTX and Texas Trust obligated themselves to ensure that they would do whatever it took to maximize the shared tax benefits, including choosing to file a consolidated return. That, however, is a promise neither entity could make. It could only be made by Centex. *See* 26 C.F.R. § 1.1502–77(a) ("The common parent, for all purposes . . . shall be the sole agent for each subsidiary in the group . . . .").

This is consistent with section 9 of the Agreement, which defines tax benefits and explains how they are to be accounted for. At paragraph (a), that section states:

[Net Tax Benefits are] the tax benefits that are attributable to the items described in § 9(a)(1), (2), (3) and (4) below ("Tax Benefit Items") and that are either utilized by [Texas Trust], or the Consolidated Group to reduce its Federal or state income tax liability in a given tax year, as calculated in § 9(b) below . . . .

Assistance Agreement § 9(a). Section 9(b) states:

The Federal Net Tax Benefits for a taxable year shall be equal to the excess, if any, of:

(1) the Federal income tax liability for such taxable year . . . which would have been incurred by [Texas Trust], or the Consolidated Group (as defined in section 1504 of the Code) of which it is a member, if the Tax Benefit Items described in § 9(a) had not been taken into account in computing such liability, but without adjustment to the bad debt reserve, over

(2) the Federal income tax liability for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by [Texas Trust], or the Consolidated Group (as defined in section 1504 of the Code) of which it is a member . . . .

*Id.* § 9(b); *accord* § 9(c) (same, for state tax benefit sharing computations). Section 9(d) of the Agreement requires payment to FSLIC thirty days after either Texas Trust or "the Consolidated Group files its Federal and state income tax returns." *Id.* § 9(d).

The term "Consolidated Group" is not defined within the Agreement, except by reference to 26 U.S.C. section 1504 (1989). That provision would include Centex, CTX, and Texas Trust as components of an "affiliated" group.

Section 9(g) recites that, if the Consolidated Group amends its federal income tax return in such a way as to impact the amounts due to be credited to the Special Reserve Account, payment would be made to the FSLIC "within 30 days of any such amendment, agreement or determination." *Id.* § 9(g).

This latter obligation of indemnification was reciprocal, and the benefit ran explicitly to the Consolidated Group. FSLIC was obliged to:

> [I]ndemnify ... the other members of the Consolidated Group for any legal, accounting, and related fees and costs incurred in connection with any administrative submission, protest or subsequent proceedings or litigation concerning the validity of Tax Benefit Items claimed by [Texas Trust], *provided* that [FSLIC] shall be give[n] notice of such submission, protest, or subsequent proceedings or litigation and shall have the right to participate therein.

*Id.* § 9(i).

Texas Trust and CTX, in short, could not have satisfied the obligations of sections 9 and 18 of the Agreement by themselves. Only Centex was in a position to do so. These obligations would be meaningless, moreover, if Centex was not contractually bound, at least in these in limited respects, to the government.

Defendant suggests that these references are irrelevant in view of section 30, which limits the benefits and obligations of the Agreement to "the parties." The term "parties" is not expressly defined, although, as indicated above, the preamble indicates that the Agreement was entered into between CTX, Texas Trust, and FSLIC. As demonstrated by the provisions reviewed above, however, Centex was included within the express terms of the Agreement, although only for limited purposes.

Moreover, the Agreement expressly incorporated "the Acquisition Agreements and any resolutions or letters concerning the Transaction or this Agreement issued by [FHLBB] or [FSLIC] in connection with the approval of the Transaction and this Agreement." *Id.* § 27(a). In *Centex I,* we noted that the parties agreed that section 27 "incorporates the four agreements whereby plaintiffs acquired the insolvent thrifts (the 'Acquisition Agreements') and the FHLBB Resolutions approving the transaction." 48 Fed.Cl. at 630. The Agreement was thus a component of a larger transaction, defined as "[t]he Acquisition and all related transactions." Assistance Agreement § 1(tt).

Centex was plainly part of that larger transaction. FHLBB Resolution No. 88–1442P states that "Centex ... proposed the incorporation and organization by the FSLIC of Texas Trust." FHLBB Resolution No. 88–1442P (Dec. 29, 1988) at 2. The resolution also required that Centex, Centex International, Inc., CREC, and CTX obtain "the approval of their respective board of directors for consummation of the transactions" detailed in the resolution. *Id.* at 27. Moreover, the resolution stated that:

> Centex and CTX may issue, sell, renew, or guarantee debt securities and assume debt in the normal course of their respective business activities without prior written approval of the FSLIC; *provided* that for as long as Centex or CTX fail to qualify as a "diversified savings and loan holding company," ... Centex and CTX shall file with the Supervisory Agent a notice showing existing and proposed indebtedness ....

*Id.* at 35.

It is noteworthy in this connection that, under sections 406(f)(4)(A) and 5(G) of the now-repealed National Housing Act, FSLIC lacked the statutory authority to enter the transaction unless the agencies were satisfied that no assistance would be provided in excess of the amount needed to liquidate the insured banks. *See* 12 U.S.C. §§ 1729(f)(4)(A), 5(G) (1988) (repealed 1989). FSLIC based its determination as to whether the transactions met that test on Centex's participation in generating the tax benefits. Although there were some initial concerns on that score, memoranda from Board Member Lawrence White indicate that the Board was satisfied that the tax calculus warranted approval of the transactions. There is every reason to assume, in other words, that, unless Centex obligated itself to cooperate in filing consolidated returns, the sale would have been in violation of law.

Construing section 30 as defendant proposes would have the effect of nullifying the specific limited terms which relate to Centex, as well as the incorporation clause. Such a construction would also fundamentally undercut the entire rationale of the agreement and

related transactions. Unlike *Home Savings of America, F.S.B. v. United States,* 51 Fed. Cl. 487 (2002), in which we declined to treat the parent as a participant in the assistance agreement, the parent in this case has certain rights and obligations under the terms of the Agreement.[5]

■ Although it is unnecessary to address Centex's implied-in-fact theory, we note that, if defendant is correct in its cramped reading of the Agreement, an implied-in-fact agreement between Centex and the government would not only not be inconsistent with the express agreement between CTX, Texas Trust, and FSLIC, it would indeed be necessary to make the entire acquisition succeed. We thus see no inconsistency with *Roedler v. Department of Energy,* 255 F.3d 1347, 1353–54 (Fed.Cir.), *cert. denied,* — U.S. ——, 122 S.Ct. 648, 151 L.Ed.2d 565 (2001) ("[T]he existence of an express contract between the United States and Northern States Power, establishing their mutual obligations with respect to the fees at issue, negates the existence of an implied-in-fact contract between the United States and the utility's customers on the same subject matter."); *see also Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997) ("[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter."). If the government is correct, the missing "subject matter" is supplied by a separate implied-in-fact contract under the terms of which Centex obligated itself to facilitate the maximization of tax benefits and the United States promised not to interfere with Centex's rights to receive those tax benefits through targeted legislation.

As discussed above, Centex also initiated the acquisition process:

> Centex Corporation ... proposes to acquire, ... through a subsidiary holding company formed by [CREC], a wholly owned subsidiary of Centex International Inc. which is in turn a wholly owned subsidiary of Centex, substantially all of the assets of, and assume substantially all of the deposit liabilities of ... the "Acquired Associations" ....
>
>     ....
>
> ... Although the exact terms and conditions of the Assistance Agreement are still under negotiation, it is expected that any definitive agreement will provide for or require substantially the following, among other things: (a) a capital infusion of approximately ... $26.5 million from Centex to be paid at closing ....

Application H-(e)1 filed on Behalf of Centex Corp. (Dec. 16, 1988) at 1–2.

The facts recited above in the background section demonstrate that Centex was the driving force behind the transaction and that the deal turned on both sides' understanding and intent that Centex, as the parent of the Consolidated Group, would be able to utilize the tax benefits and share them with FSLIC. Senior Centex officers negotiated directly with FHLBB Board Members and negotiators. The focus was on Centex's ability to utilize the benefits. Centex asked for and received a private letter ruling from the IRS assuring both FSLIC's and its own ability to utilize the tax benefits. Centex submitted proposed term sheets and other negotiation documents in its own name. In costing the deal, both sides expressed an understanding that the Centex Consolidated Group would be utilizing the tax benefits. Centex's Board of Directors approved the transactions, as required by the FHLBB resolution approving Centex's acquisition. FHLBB approved the transaction with the express understanding that "FSLIC and Centex will share tax benefits." FHLBB Recommendation Mem. from Stuart D. Root, Exec. Dir., FSLIC, and Jordan Luke, General Counsel, FSLIC, to FHLBB (Dec. 29, 1988) at 13. Centex put up cash and other assets to close the deal. In its press release announcing the deal, FHLBB stated that Centex was the buyer.

Whether viewed as a party with limited rights and obligations under the express terms of the Agreement, or as a party to an implied contract covering a larger transac-

---

5. We find that this case is also distinguishable from *FDIC ex rel. Karnes County Sav. and Loan Ass'n v. United States,* No. 91–993C (Fed.Cl. May 29, 2002), in which the court found that investors in a failed savings and loan institution did not have privity with the government.

tion, the government and Centex were contractually bound to each other.

## CONCLUSION

The government's motion to dismiss Centex is denied.