**CENTEX CORPORATION,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–494C.

United States Court of Federal Claims.

Feb. 24, 2003.

Kent A. Yalowitz, Arnold & Porter, Washington, D.C., argued for plaintiffs. With him were Melvin C. Garbow, Mark W. Stoutenburg, Pamela A. Miller, Howard N. Cayne, Thomas R. Dwyer, and Michael A. Johnson, of counsel.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant. With him were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Scott D. Austin, Glenn I. Chernigoff, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*[1] related contract action are plaintiffs' motion for summary judgment on damages and the government's cross-motion for summary judgment. Oral argument was held on November 8, 2002. Additionally, on December 19, 2002, the court

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

took testimony from two witnesses pursuant to RCFC 42(b) on the issue of plaintiffs' covered asset losses ("CALs").[2] For the reasons set out below, the defendant's motion is granted in part and denied in part and the plaintiffs' motion is granted in part and denied in part. After trial regarding the plaintiffs' CALs, the court finds in favor of the plaintiffs on that issue.

## BACKGROUND

The background facts giving rise to this litigation can be found in *Centex Corp. v. United States*, 48 Fed.Cl. 625 (2001) *("Centex I")*, *Centex Corp. v. United States*, 49 Fed.Cl. 691 (2001) *("Centex II")*, and *Centex Corp. v. United States*, 52 Fed.Cl. 599 (2002) *("Centex III")*. Familiarity with those opinions is presumed. In *Centex I*, the court held that the plaintiffs had not contractually released their rights to sue, that the relevant tax deductions recognized by the parties were legally available, and that there was no promise by the government regarding the continued availability of those tax deductions. In *Centex II*, we held that the government breached the implied covenant of good faith and fair dealing by enacting the "Guarini" legislation,[3] which eliminated the tax deductions in a targeted, retroactive fashion. Lastly, in *Centex III*, we denied defendant's motion to dismiss Centex Corporation for lack of standing and held that it and the defendant were contractually bound. We now resolve the issue of damages.

In 1988, the Federal Savings and Loan Insurance Corporation ("FSLIC") approached Centex Corporation ("Centex") regarding substantial available tax benefits, including the deductibility of CALs, if Centex acquired failing thrifts which were then under FSLIC supervision. FSLIC favored offers from "tax efficient" bidders such as Centex. Centex agreed to purchase several thrifts based in material part on the tax benefits available from the transaction. The Federal Home Loan Bank Board ("FHLBB") later described the deal as "tax driven."

Centex created CTX Holding Company ("CTX") in preparation for acquiring the thrifts. CTX then acquired Texas Trust Savings Bank, FSB, Llano, Texas ("Texas Trust") at the end of 1988 in an FHLBB-approved and FSLIC-assisted transaction. On that same day, Texas Trust acquired the assets and assumed the liabilities of four failing thrifts: Peoples Savings and Loan Association ("Peoples"), Ranchers Savings Association ("Ranchers"), Lee Savings Association ("Lee"), and Burnet Savings and Loan Association ("Burnet").

In connection with this acquisition, FSLIC, Texas Trust, and CTX—the sole shareholder of Texas Trust—entered into an Assistance Agreement. In short, this Agreement allowed Centex[4] to take advantage of all tax benefits gained from acquiring the failing thrifts but also required Centex and FSLIC to share those benefits. Specifically, the Assistance Agreement required Centex to share with FSLIC 50% of all tax benefits produced. FSLIC, in return, allowed Centex to acquire the thrifts and agreed to reimburse Centex for book losses on the covered assets. Centex therefore received, based on the newly-acquired CALs, both tax benefits and FSLIC

---

2. Under the Assistance Agreement, a CAL is the difference between the book basis of covered assets and their subsequent lower yield at disposition. This difference was used to calculate debit payments from the Federal Savings and Loan Insurance Corporation to plaintiffs under the Assistance Agreement. An asset's tax loss is closely related to its book loss, because an asset's book basis often equals its tax basis and an asset's eventual yield impacts both types of losses. This tax loss on disposition of assets was used in Centex's calculation of its tax deductions which, in turn, generated tax benefits shared under the Assistance Agreement. Throughout this opinion, "CAL" may refer to both covered asset book losses and tax losses.

3. This legislation, the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224 (1993), is named for its primary sponsor, Representative Frank Guarini.

4. In *Centex III*, we held that Centex Corporation either had "limited rights and obligations under the express terms of the [Assistance] Agreement, or [it was] a party to an implied contract concerning a larger transaction." 52 Fed.Cl. at 606–07. The net effect was the same: Centex Corporation, on behalf of the consolidated group had a legitimate expectation to enjoy the tax benefits under the agreement. For purposes of this opinion, "Centex" will be used in the broadest sense to mean Centex and the other bank signatories, unless otherwise indicated.

reimbursement payments, resulting in a permissible "double-dip" for the same losses.

The agreement also required the Centex group of corporations to file their consolidated tax return in a way that maximized tax benefits both to Centex and FSLIC. Under the tax code, Centex was obligated to file a consolidated income tax return, including CTX and Texas Trust. Centex filed its federal and state income tax returns as the parent of a consolidated group for all relevant years.

Soon after Centex acquired the thrifts, Jeff Mason of Centex's tax department began a long process of computing CALs acquired at the time of acquisition. He has a bachelor's degree in business and he joined the Centex tax department in 1988 after doing three years of tax and auditing work at a CPA firm. When he testified, the court found Mr. Mason to be a very competent and credible witness.

Both Centex and FSLIC were interested in knowing both full book and tax bases of acquired covered assets. Centex needed to know tax basis in order to prepare its federal and state income tax returns, as well as to compute its alternative minimum tax. FSLIC needed to verify book losses to confirm that it was making proper reimbursement payments to Centex.

CALs, for purposes of determining reimbursement, were determined by subtracting the proceeds of disposition of an asset from the book basis of that asset. Tax sharing, however, was a function of tax deductions. These deductions, in turn, were a function of the difference between tax basis and proceeds. The tax basis may have been different from book basis for any particular asset because some of the acquired thrifts may have written down the tax basis before acquisition. Mr. Mason therefore needed to determine book basis *and* tax basis for each

covered asset. He compiled a master list for each covered asset which showed any instance in which the book basis differed from the tax basis. He used information from many different sources, including the tax records of the acquired thrifts. He contacted the accounting firms which had prepared the thrifts' tax returns and travelled to Peoples (the largest of the four acquired thrifts) and Texas Trust to gather information from their ledgers. He also used the final receivership tax returns of the four acquired thrifts, prepared by Deloitte Haskins & Sells on behalf of the Federal Deposit Insurance Corporation ("FDIC")[5] in March 1990. In December 1990, he finished the master list. The result was a complete catalog of each covered asset with its book and tax basis and any difference between the two.

Mr. Mason's master list of book and tax basis became extremely important to Centex. The list provided a precise foundation for Centex to claim CAL tax deductions.[6] Even after Guarini, Centex still used the master list of book and tax bases for other tax purposes. As explained below, after Guarini, the master list also serves as a basis for Centex's calculation of what it lost from the bargain in terms of tax benefits.

As Mr. Mason worked at compiling the master list, Centex filed its tax returns for the years 1988, 1989, and 1990. The IRS closely scrutinized each of Centex's returns and its CAL deductions. It eventually audited Centex three times. The first audit covered tax years 1988, 1989, and 1990 ("88–90 audit"); the second audit covered 1991 and 1992 ("91–92 audit"); and the third covered 1993 and 1994 ("93–94 audit").

For tax years 1989 and 1990, Centex claimed several deductions for CALs. During the 88–90 audit, the IRS questioned Centex's bad debts, bad debt reserves, CALs, FSLIC

---

5. Insofar as relevant here, FDIC succeeded FSLIC.

6. For losses subject to I.R.C. § 165, plaintiffs' deductions reduce taxable income directly. For losses under I.R.C. § 593, there was not an immediate translation between a CAL and a tax deduction. The process was intermediated in part through a bad debt reserve account set up on the company's books. The company could

take a tax deduction for additions to the bad debt reserve, while subsequent disposition of an asset would eventually result in a charge-off to the reserve. Despite some confusion raised in defendant's briefing, the details of that intermediation turn out not to matter to the correctness of plaintiffs' calculation. Consequently, we will refer in shorthand to the CAL as a "deduction."

reimbursement, tax attribute carryovers, and the percentage of assets test for qualifying as a thrift. The IRS initially proposed disallowance of several different transactions related to CALs and the Assistance Agreement. Specifically, the IRS issued Information Document Request ("IDR") 4b in September 1991, which asked Centex to "reconcile the differences in total assets per schedules (unnumbered) in the returns to the assets shown in the balance sheets." Centex and the IRS negotiated over these proposed changes and then entered into a closing agreement in March 1993 which resolved the 88–90 audit and prevented future changes to those returns. After signing this agreement, the IRS immediately began its 91–92 audit.

Congress passed the Guarini legislation in August 1993, five months after the 88–90 audit closed. Guarini was retroactive to March 1991, making CALs non-deductible after that date. By August 1993 and the enactment of Guarini, Centex had completed its tax returns for 1991 and 1992, although the 91–92 audit was underway.

Centex had claimed CAL deductions on its 1991 & 1992 returns. Because of Guarini, however, the IRS reversed several of those deductions and, along with state examiners, imposed statutory interest and penalties on Centex in the amount of $345,631. The 91–92 audit was resolved completely in March 1995 without disturbing Centex's rights in this action. Thereafter, the IRS began the 93–94 audit, which was resolved in December 1998.[7]

Soon after the passage of Guarini, Centex began negotiations with the government to terminate the Assistance Agreement. The parties entered into negotiations with the understanding that plaintiffs wanted to sue the United States for breach of contract. Centex initially estimated its claim at between $50 million to $60 million. The original Assistance Agreement contained an indemnity clause providing that the FDIC would reimburse Centex for litigation expense concerning tax benefits under the con-

tract. The contract also reserved the FDIC's right to "participate" in any lawsuit for breach of contract. If the original Assistance Agreement had remained in place and Centex had prevailed in a lawsuit against the United States, the parties understood that the FDIC would have to assist in funding this litigation but would also receive 50% of any judgment.

The parties signed a Termination Agreement in December 1994 which ended Assistance Agreement obligations. Section 9.2 of that agreement reads:

> Section 9.2 *Release by Texas Trust and CTX.* Texas Trust and CTX hereby release ... each of the FDIC Manager and the FRF (and the respective successors ... of each of the foregoing) (collectively, "FDIC Released Persons") from any and all actions ... that Texas Trust and CTX now have, have had at any time heretofore, or hereafter may have against the FDIC Released Persons ... in connection with ... the Assistance Agreement ...; *provided, that* the release provided in this Section 9.2: ... (iv) shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager) based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF)—assisted acquisition of substantially all the assets and the secured and deposit liabilities of the Acquired Associations, and in the event that any such claim is brought, the FDIC Manager shall not be obligated to pay the expenses of such litigation and shall not be entitled to share in any recoveries.

The plaintiffs claim that, but for Guarini, Centex would have taken CAL deductions beginning in 1991 and ending in 1995, the year the Assistance Agreement was later mutually terminated. Six issues are raised in the parties' cross-motions for summary

---

7. Centex commenced a refund suit in the District Court for the Northern District of Texas regarding the 91–92 audit. That case concerns a bad debt expense deduction of $5 million which was disallowed by the IRS. If allowed, the deduction might have increased plaintiffs' damages. The litigation is still ongoing. In computing its damages in this case, Centex did not assume that it would prevail in that case. Instead, it excluded the amount from its calculations.

judgment: (1) whether Centex Corporation, specifically, has standing to pursue a claim against the government; (2) whether, as plaintiffs claim, Centex actually had $160,763,046 in CAL deductions that would have resulted in a $55,510,947 decrease in federal and state taxes; (3) whether plaintiffs are entitled to a "grossed up" recovery in order to offset income tax liabilities; (4) whether plaintiffs may recover $345,631 in statutory interest and penalties incurred as a result of the government's breach; (5) whether plaintiffs may recover $12,660,732 for borrowing expenses incurred as a result of the government's breach; and (6) whether the Termination Agreement allows plaintiffs to recover 100% of anticipated Assistance Agreement tax savings or only 50% of that amount.

## DISCUSSION

### I. Standing

■ In December 1994, CTX and Texas Trust both signed the Termination Agreement. Centex did not sign this document. The government now argues that Centex may not contractually bring suit against the government because § 9.2(iv) specifically allows only Texas Trust and CTX to bring claims against the United States. It points out that § 9.2 is titled "Release by Texas Trust and CTX." No other part of § 9.2 specifically mentions Centex Corporation.

We hold that Centex retains its right to sue the United States despite the Termination Agreement. The government's argument assumes that Centex Corporation gave up rights in that agreement. It did not. Section 9.2 states merely that it "shall not operate in any way to limit" CTX or Texas Trust from making a claim against the government. It is not an affirmative authorization to sue. Instead, it terminates the claims of CTX and Texas Trust against the FDIC, but specifically does not limit their ability to sue the United States. Texas Trust, CTX, and Centex already possessed a right to sue the United States before execution of the Termination Agreement. Section 9.2 did not

restrict this right. *See First Nationwide Bank v. United States*, 48 Fed.Cl. 248, 257–58 (2000) (holding that the termination of the parties' Assistance Agreement did not affect any of plaintiffs' causes of action accruing prior to execution of the Settlement Agreement).

### II. Claim for CAL Deductions

■ The issue upon which the court took evidence concerned the correct amount of lost deductions. The calculation leading to that figure involves many components, but only one appeared to be disputed: the correct number for the book-tax basis difference at the time of acquisition. The larger the number, the smaller the potential deduction. Plaintiffs' figure of approximately $47.7 million, sponsored by Mr. Mason, and used by plaintiffs and FSLIC for several years independently of this litigation, was questioned by government's expert, Mr. William Wolf, although he did not sponsor a specific figure himself. As explained below, we are fully satisfied that plaintiffs' figure is completely reliable.

Plaintiffs contend that the government's breach of the Assistance Agreement resulted in damage to the extent that the consolidated group paid additional tax due to the passage of Guarini. Specifically, they assert that the government's breach prevented them from recognizing $160,763,046 in CALs during 1991–1995. This figure is derived from total reimbursements from 1989 to 1995 as computed by Centex's tax department and audited by the FDIC, approximately $241.3 million. This figure is undisputed. Plaintiffs then calculate the resulting tax savings lost by making certain adjustments, most of which are also undisputed. The government, however, was unwilling to stipulate to the largest adjustment—the difference between book basis and tax basis at acquisition. That dispute prompted the evidentiary hearing. To the resulting amount, plaintiffs apply applicable federal and state tax rates.[8] This

8. In seven states, federal taxable income is the starting point for determining state taxable income. Consequently, Guarini had the collateral effect of increasing state tax liabilities for plaintiffs.

operation results in plaintiffs' damages claim of $55,510,947.

As set out above, Mr. Mason testified how he verified a beginning book/tax difference of $47.7 million. In its cross-motion for summary judgment and at trial, defendant relied primarily upon its expert, Mr. Wolf. Mr. Wolf, who has thirty years of experience in public accounting and is a CPA tax accounting partner with White, Zuckerman, Warsavsky, Luna & Wolf, furnished two reports during the briefing. The government later withdrew the second report, after it caused no small amount of confusion. In his remaining report, Mr. Wolf presented several critiques of Mr. Mason's findings as to the total amounts of CALs. Many of these critiques were later withdrawn, but one theory survived to create a genuine issue of material fact: Mr. Wolf suggests that the actual figure for the opening book/tax basis difference may have been higher than $47.7 million. He offers no competing figure, but indicates that he is not satisfied that Mr. Mason did an adequate job reconciling the book/tax differences. Mr. Wolf also points to two documents which he believes draw plaintiffs' figure into question.

We reject both grounds for Mr. Wolf's reservations. First, unlike Mr. Wolf, whose credibility suffered greatly in the court's eyes both from the quality of his written reports and from his in-court presentation, Mr. Mason was highly credible. The court had no reason to doubt either his veracity or the effectiveness of the extensive investigation he undertook. Mr. Wolf offered nothing other than his own unspecified suspicion that the calculations might be incomplete or wrong. Second, Mr. Mason fully explained why the two documents in no way impugned the final reconciliation. The first was IDR 4b, mentioned previously. The second was a June 29, 1989 memorandum from Mr. Mason to his superiors warning of a possible problem with respect to Texas Trust's ability to meet an asset test essential to continued favorable tax treatment as a savings and loan. Both documents contain estimates of a larger book/tax difference than that figure ultimately established. But they were both known at the time to be estimates, and rough estimates at

best. The documents were prepared far in advance of all the final data used to reconcile the book/tax differences and ultimately turned out to be very inaccurate. They cannot serve as a basis for disputing the final figures.

We note also, in passing, that the government in its briefing made much of what it termed a "recalibration" of Centex's damages claim, making adjustments based on certain assumptions. This recalibration appeared for the first time as a chart prepared by counsel in support of the defendant's brief opposing plaintiffs' motion for summary judgment. It purported to show that plaintiffs' claim was overstated. The chart was initially unsponsored by any witness. At the hearing, however, Mr. Wolf attempted to defend its use to impeach plaintiffs' damage calculation. In short, he was unable to do so. Mr. Wolf conceded during cross examination that key elements of the chart were wrong or inexplicable. Defendant did not examine him on redirect.

The government makes two additional arguments. First, it asserts that Centex and CTX, as individual corporations, had no taxable income to offset during the relevant period. The government and Mr. Wolf highlight figures from Centex's consolidated tax returns for 1988 through 1996. This observation is irrelevant. Centex Corporation, as parent, filed consolidated tax returns on behalf of itself and its subsidiaries at all relevant times. Indeed, as we held in *Centex III*, 52 Fed.Cl. at 601–03, 604–06, the parties structured the original Assistance Agreement so that Centex not only could, but had to utilize the tax benefits on a consolidated basis. A consolidated return is a legally recognized form that allows a group of entities to collectively file one tax return. "The basic principle of the consolidated return is that the group is taxed on its consolidated taxable income, representing … its dealings with the outside world after the elimination of intercompany profit and loss…. Operating losses of one affiliate can be offset against profits of other members of the group." 2 Boris Bittker & James Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 13.40, 13.42[1][b] at pp. 13–95 to

13–96, 13–109 (7th ed.2002); *see Garvey, Inc. v. United States,* 1 Cl.Ct. 108, 111, 116 (1983) ("consolidation offers the opportunity to offset losses of one company against profits of another.").

Centex had the right to represent its subsidiary entities for tax matters. "Corporations in an affiliated group filing consolidated returns are treated as departments of a single entity." *Garvey,* 1 Cl.Ct. at 111; *see also International Telephone & Telegraph Corp. v. United States,* 221 Ct.Cl. 442, 608 F.2d 462, 474 (1979) (recognizing that a group of corporations filing a consolidated return are one taxpayer for United States tax purposes); Bittker & Eustice, *supra,* ¶ 13.41[4][b], at 13–108 ("The parent corporation is made the exclusive agent for all includible corporations ...."). Contrary to defendant's suggestions, this is true regardless of internal tax allocation agreements. *See Home Group, Inc. v. Comm'r,* 92 T.C. 940, 942, 1989 WL 47466 (1989) (holding that each subsidiary liable for taxes of entire group "notwithstanding the allocation of tax liability or other intercompany agreements."); Bittker & Eustice, *supra,* ¶ 13.41[4][b], at 13–107 to 108 (sharing agreements are contemplated by the regulations).

The government's standing concerns are therefore misplaced. Centex has standing to assert claims on behalf of the entire consolidated tax entity as long as the entity had taxable income to offset. "The tax liability of an affiliated group filing a consolidated return is computed on its consolidated taxable income." Bittker & Eustice, *supra,* ¶ 13.42[1][a], at 13–108. It is undisputed that the Centex consolidated group had taxable income for the period 1991–1995.

Lastly, the government once again offers the argument that the IRS might have disallowed some of the deductions, even absent the Guarini legislation. We ruled previously as a matter of law that the tax benefits were available prior to the enactment of the Guarini legislation. *See Centex I,* 48 Fed.Cl. at 634–36. We note, moreover, that the IRS rejected CAL deductions in its 91–92 and 93–

94 audits based on the passage of the Guarini legislation. Other IRS "disallowances" highlighted by defendant were resolved by settlements between Centex and the IRS. Plaintiffs' damage calculations build on the final tax returns, as audited.

We conclude that plaintiffs have established that the passage of the Guarini legislation resulted in the loss of $160,763,046 in CAL deductions that would have resulted in federal and state tax savings of $55,510,947.

### III. Gross-up claim

█ Plaintiffs urge that this amount needs to be "grossed up" by $32,814,068 to account for the income taxes that they might have to pay as a result of this judgment. In the alternative, they suggest that we should make our judgment conditional, based upon the tax treatment of the award. We disagree.

It is true that gross-up of damages is sometimes appropriate to account for income taxation. And we agree that, although this is not a tax case, it is necessary for the court to address the question. When a plaintiff bargains for an after-tax benefit, the damages should be adjusted, if necessary, to deliver the benefit of the bargain, and thus courts have sometimes adjusted damage awards to offset foreseeable adverse tax consequences flowing from a contract breach. *See Oddi v. Ayco Corp.,* 947 F.2d 257, 267–68 (7th Cir. 1991) (allowing an award in a breach of contract action to account for the post-judgment tax when the plaintiff bargained for an after-tax result); *Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80 (2d Cir.1961) (allowing an award for breach of employment contract to be adjusted for adverse tax consequences when the parties initially contemplated the tax advantages from the contract). Our predecessor court has adjusted damage awards to account for taxes in other circumstances. *E.g., Shaw v. Secretary of Dep't of Health and Human Servs.,* 18 Cl.Ct. 646, 654 (1989) (increasing award in vaccination case where "the award should be adjusted to offset taxes which will be paid on income").[9]

---

9. *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64 (1999), *aff'd in part, rev'd in part on*

*other grounds, remanded,* Nos. 00–5005, 00–5027, 2003 WL 105250 (Fed.Cir. Jan.14, 2003), relied

The need for gross-up assumes, however, that any recovery here is taxable. The accuracy of that assumption is not without doubt. Defendant cites *Clark v. Commissioner*, 40 B.T.A. 333, 1939 WL 11 (1939), and Rev. Rul. 57–47, 1957–1 C.B. 3, 1957 WL 11946 (1957). In each instance, taxpayers overpaid taxes due to faulty advice from tax consultants. The taxpayers eventually were compensated by their consultants and then both opinions examined the tax treatment of this repayment. Neither authority required the taxpayer to include the repayment as income.

The plaintiffs, however, point to evidence of a more recent change in IRS policy. There have been at least five Private Letter Rulings which distinguish *Clark* and suggest that the IRS may tax an award resulting from breach of contract damages. *See* Priv. Ltr. Rul. 98–33–007, 1998 WL 473910 (Aug. 14, 1998); Priv. Ltr. Rul. 97–43–035 (July 28, 1997); Priv. Ltr. Rul. 97–43–034 (July 28, 1997); Priv. Ltr. Rul. 97–28–052 (Apr. 16, 1997); Priv. Ltr. Rul. 92–26–033, 1992 WL 808824 (June 26, 1992). Each of these rulings include any reimbursements for tax liability as gross income so long as the taxpayer initially paid only its minimum proper federal income tax. *E.g.*, Priv. Ltr. Rul. 98–33–007, 1998 WL 473910 (Aug. 14, 1998) ("unlike the situations in *Clark* and Rev. Rul. 57–47, 1957 WL 11946, you are not paying more than your minimum proper federal income tax liability .... Therefore, ... the indemnity payment ... is includible in your gross income.").[10]

The distinction between *Clark* and the subsequent rulings is indeed subtle. In this instance, however, it should be clear that it would be unfair to treat the judgment as new income. The judgment is not a replacement of lost income. Instead, plaintiffs are receiving monies already subject to tax once before. Indeed the entire point of the breach claim is that the judgment represents tax or penalties that, but for the breach of contract, would not have been paid. The money that the plaintiffs would have saved in the absence of a breach had, by definition, already been taken into account for tax purposes. It follows that an award from this court to compensate plaintiffs for the loss of that money is not subject to income tax. It represents income already taxed. If we grossed-up damages, in other words, and the judgment later was not taxed, it would result in a windfall to the plaintiffs. Additionally, we decline to consider a conditional judgment based on an opposite assumption, when, in our view, that assumption would be incorrect as a matter of fact and law.[11]

## IV. Statutory Interest and Penalties

◼ The plaintiffs argue that they are entitled to be reimbursed the $345,631 they paid in statutory interest and penalties arising from the retroactivity of the Guarini legislation. Centex filed its 1991 and 1992 consolidated tax returns and paid those taxes before Congress passed Guarini. After the legislation, the IRS and state examiners disallowed Centex's deduction of CALs for those taxable years and Centex paid the interest and penalties imposed. The plaintiffs now ask the court to award them the resulting total amount on summary judgment.

We agree with plaintiffs that the $345,631 in statutory interest and penalties was as fully foreseeable a result of the breach as was the increase in tax liability due to plaintiffs' inability to claim the CAL deductions. In our view, there is no principled basis to distinguish the two types of damages.

---

on by defendant, is not to the contrary. The court in *LaSalle* refused the gross-up claim because the plaintiff's argument, if adopted, required the court to make too many assumptions about both past and future taxability and tax rates. *LaSalle Talman*, 45 Fed.Cl. at 110.

**10.** Private Letter Rulings generally are not citable as precedent, although they may be used to divine the intent of the IRS. *Hanover Bank v. Commissioner*, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962) (stating that private letter rulings "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws"); *Snap–On Tools, Inc. v. United States*, 26 Cl.Ct. 1045, 1060 (1992) ("Private Letter Rulings, although evidence of the Commissioner's administrative practice on a particular issue are not binding authority."), *aff'd*, 26 F.3d 137 (Fed.Cir.1994).

**11.** We note, however, that RCFC 60(b) would remain available to plaintiffs in the event this assumption is incorrect.

## V. Borrowing Costs

■ The plaintiffs argue that they should receive $12,660,732 to account for out-of-pocket borrowing expenses which they allege were foreseeably incurred as a direct result of the government's breach. The breach allegedly caused the plaintiffs to borrow additional money to pay unexpected resulting taxes.

Plaintiffs claim that these borrowings were prompted by the need to accommodate the unexpected increase in taxes. Not surprisingly, plaintiffs offer no direct proof that the parties discussed Centex's need for borrowed cash in the event of breach. Nor, however, is Centex able to offer any direct evidence of borrowings specifically prompted by the need to react to the breach. Instead, it builds its case for foreseeability and causation as follows: The government's breach caused Centex to pay taxes and penalties that it otherwise would not have paid. Because Centex was a net borrower at all relevant times, taking on debt would have been the only source of capital to pay the additional taxes and penalties. Therefore, plaintiffs must have incurred additional borrowing costs as a result of the breach, because the government's breach necessarily and foreseeably caused additional borrowing to pay taxes and penalties. The government counters with evidence that plaintiffs had cash balances at the end of each fiscal year from 1989 through 2001. There is no question that plaintiffs had hundreds of millions in cash flows during these years.

Unless specifically permitted under a contract or by an Act of Congress, "interest on a claim" against the United States is disallowed under 28 U.S.C. § 2516(a) (1994). Courts frequently distinguish, however, between "interest *on* a claim," generally precluded by the statute, and "interest *as* a claim" which courts may treat as an element of compensation. For that reason, it has been held that foreseeable financing costs can be an element of expectancy damages. *See Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1354–58 (Fed.Cir.

2001). *See also Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 162–63 (2002). Plaintiffs must prove both foreseeability and causation with reasonable certainty. *Bluebonnet II,* 266 F.3d at 1355–58.

We agree with defendant. The evidence is too attenuated to conclude either that the possibility of an impact on borrowings was part of the bargain or that there is sufficient evidence of causation. Unlike *Bluebonnet,* in which there was substantial evidence that the negotiators understood that the purchasers were depending on the continued flow of dividends to finance the purchase, here there is no comparable evidence of foreseeability. The sole indication of causation is that plaintiffs were net borrowers. We hold that the possible need to borrow is too remote from the breach to be a compensable effect of the Guarini legislation. We construe what Centex seeks as tantamount to interest on their claim, or else, to the extent it amounts to an independent claim, it is unrecoverable as both unforeseeable and not directly connected. *Cf. J.D. Hedin Constr. Co. v. United States,* 197 Ct.Cl. 782, 456 F.2d 1315, 1329–31 (1972) (denying award of interest on a bank loan resulting from financial stringency due to an improper termination by the government on a construction contract). We therefore grant summary judgment to the defendant on this issue.

## VI. Termination Agreement 50% Clause

■ Plaintiffs contend that the recovery should consist of 100% of the $55,856,578 in additional tax and penalties paid.[12] In other words, the award should not be discounted by 50% to account for plaintiffs' original obligation to split the savings with the FDIC. This contention, and the parties' disagreement about how to resolve it, flows from the Termination Agreement. Under the original Assistance Agreement, the FDIC was entitled to 50% of tax savings. Plaintiffs, however, maintain that § 9.2 of the Termination Agreement changed that arrangement and allows them to recover 100% of the award. We disagree.

12. $55,856,578 is derived, thus far, from $55,510,947 awarded in section II plus $345,631 awarded in section IV.

The court held previously that the government breached its duty of good faith and fair dealing not to interfere with the plaintiffs' bargained-for benefits in connection with the terms of the original acquisitions. Plaintiffs are entitled to the benefit of that original bargain, which, insofar as relevant here, means they were entitled to keep 50% of the CAL tax benefits.[13] "[T]he parties to the contract here agreed to a fifty-fifty split of the benefits derived from the covered asset loss deduction . . . ." *Centex II*, 49 Fed.Cl. at 708. Plaintiffs did not bargain for 100% of the tax benefits. More to the point, plaintiffs have only established a breach of good faith and fair dealing with respect to their 50% share. The court has never held that the FDIC was an aggrieved party.

Plaintiffs counter this problem by pointing to the Termination Agreement, the effect of which was to end the balance of the Assistance Agreement and end both FDIC's claim on its part of the lawsuit proceeds and its obligation to share in the costs of the suit. The language in § 9.2 that the release of the FDIC "shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States" does not imply that the plaintiffs' claim has been expanded, however. Plaintiffs never owned a claim to 100% of the tax benefits. The language simply means that it will not limit plaintiffs' claim to its 50% share.

The plaintiffs are mistaken that broadly construing the terms "claim" and "recoveries" assists them. They may maintain only whatever claim they had against the United States prior to the Termination Agreement. These permissive definitions encompass only previous claims. Section 9.2 then carves restrictions on claims against the FDIC from these previously-allowed claims. Other claims remained intact but were not expanded. Adopting plaintiffs' definitions of these two terms remains consistent with the government's interpretation of § 9.2 as a whole. Section 9.2 leaves the plaintiffs' original right to sue the United States for breach unmodified.

Plaintiffs' real argument is that the FDIC abandoned its 50% claim and that the plaintiffs inherited it. Section 9.2 of the Termination Agreement eliminated the FDIC as a potential claimant in this litigation: "the FDIC Manager ... shall not be entitled to share in any recoveries." It also released the FDIC from its obligation to reimburse the plaintiffs: "the FDIC Manager shall not be obligated to pay the expenses of such litigation." There is no assignment of this abandoned claim, however, to the plaintiffs. Nor, as explained above, would it simply default to plaintiffs.

The plaintiffs are entitled to 100% of the award from this court without sharing it with the FDIC. But that 100% consists of the benefits they bargained for, namely, 50% of tax benefits under that contract. This conclusion, however, does not affect the plaintiffs' statutory interest and penalties because these damages did not derive from the Assistance Agreement. The FDIC and Centex never agreed to share interest and penalties. These payments were solely plaintiffs' responsibility.

## CONCLUSION

Plaintiffs' motion for summary judgment on damages is granted in part and denied in part. Defendant's motion is granted in part and denied in part. The court holds, after trial, that the plaintiffs have proved the amount of their CALs. Judgment for plaintiffs in the total amount of $28,101,105 (50% of $55,510,947 plus $345,631, rounded to the nearest dollar). Costs to plaintiffs.

---

**13.** *See Wells Fargo Bank v. United States*, 88 F.3d 1012, 1021 (Fed.Cir.1996) ("The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed.").