## LOCAL OKLAHOMA BANK, N.A., Plaintiff,

v.

## The UNITED STATES, Defendant.

No. 96–584C.

United States Court of Federal Claims.

Feb. 26, 2004.

Melvin C. Garbow, Washington, D.C., for plaintiff Local Oklahoma Bank. With him on the briefs were Kent A. Yalowitz, Howard N. Cayne, Thomas R. Dwyer, Mark W. Stoutenberg, all of counsel.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Glenn I. Chernigoff, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owlsey, all of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] case are plaintiff Local Oklahoma Bank's [2] motion for summary judgment on damages and defendant United States' cross-motion for summary judgment. Oral argument was held November 5, 2003. For the reasons set out below, both parties' motions are granted in part and denied in part.

## BACKGROUND

The background facts giving rise to this litigation can be found in *Local America Bank of Tulsa v. United States*, 52 Fed.Cl. 184 (2002) ("*Local I*"). Familiarity with that opinion is presumed. In *Local I*, the court held that the government was liable for breaching an implied promise of good faith and fair dealing, when, after inducing Local to take over a failing thrift in exchange, in part, for the opportunity to claim covered asset loss [3] ("CAL") tax deductions, it then targeted those contract benefits for legislative repeal. *Id.* at 190.

The December 29, 1988, Assistance Agreement between Local and the Federal Savings and Loan Insurance Corporation ("FSLIC") [4]

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. The original complaint named as plaintiffs Local America Bank of Tulsa, Local America, Inc., and Local Federal Bank, FSB. On November 30, 1998, Local America Bank of Tulsa merged with Local Federal Bank. At this time, Local America, Inc. was liquidated and ceased to exist. On April 1, 1999, Local Federal Bank, FSB changed its name to Local Oklahoma Bank. Local Oklahoma Bank is now the sole plaintiff. We will refer to any of the above-named institutions simply as "Local."

3. An Assistance Agreement was entered into between Local's predecessors, and the FDIC's predecessor, the FSLIC, on December 29, 1988. The Assistance Agreement, at section 1(m), in relevant part, defines "covered asset" as "each asset owned by the ACQUIRING ASSOCIATION." At section 1(n), it defines "covered asset loss" as the "amount ... (i) by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the ACQUIRING ASSOCIATION upon the liquidation of such covered asset, or (ii) of any write down in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 4."

4. The FSLIC was abolished by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and the FDIC was designated as its successor to administer the FSLIC's assets and liabilities.

was executed in order to facilitate Local's acquisition of a failing thrift, Community Federal Savings and Loan.[5] The Assistance Agreement provided for an equal division of the CAL and other tax benefits between Local and the FDIC.[6] Assistance Agreement § 9.

Local was required by Section 9 of the Assistance Agreement to make sharing payments to FSLIC thirty days after Local filed its yearly tax returns. Sharing payments were accomplished by Local crediting Special Reserve Account I, an account established as a mechanism for accounting for payments pursuant to the agreement. The Assistance Agreement expired on December 29, 1993, but the tax benefit sharing obligation survived the expiration of the agreement[7] because the tax consequences of the various deductions and assistance would not be immediately apparent. There would be a delay until the tax returns were finalized.

On August 9, 1993, Congress enacted the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, 107 stat. 312, 485 (1993) (the "Guarini legislation"). Section 13224 of the act retroactively eliminated CAL tax benefits. Thereafter, Local made no more tax sharing payments contemplated by the Assis-

tance Agreement. Local's first tax return filed after the breach was for the tax year ending June 30, 1993, and payment was due on March 15, 1994. Local failed to make sharing payments of $2.4 million due on April 14, 1994 and $14.9 million due on April 14, 1995. Ultimately, Local would withhold a total of $20 million dollars in non-CAL tax sharing payments.

Local characterizes these withholdings as legitimate "self help" set-offs. It claims it had the right to do so because it believed it should be compensated for the effects of the Guarini legislation. Local took the position that it was entitled under Section 9(f)[8] of the Assistance Agreement to make a debit entry to Special Reserve Account I to compensate itself for the CAL tax benefits that were eliminated by the passage of the Guarini legislation. Evidence of Local's position is provided by the correspondence between the FDIC and Local.[9]

Local filed its complaint on September 17, 1996 claiming breach of express contract, a taking without just compensation, deprivation of due process, unjust enrichment, restitution, reformation, breach of implied contract, taking of implied contract rights, frustration of purpose, and failure of

5. Community Federal was a combination of two failed Tulsa area thrifts that the Federal Home Loan Bank Board ("FHLBB") had placed in receivership. FHLBB actively marketed the "tax benefits" of acquiring Community Federal to potential purchasers. FHLBB was abolished by FIRREA, and its responsibilities transferred to the FDIC.

6. Other tax benefits arose from net operating loss ("NOL") carryforwards, indemnification payments, and the tax-free character of FSLIC notes.

7. By December 29, 1993, Local had incurred all the CALs for which it sought reimbursement from the FDIC.

8. Section 9(f) provides:

Disallowed Deductions. In the event Net Tax benefits are paid with respect to Tax Benefit Items that are subsequently disallowed or that cease to be Tax Benefit Items because it is determined that payments with respect to such Tax Benefit Items are not to be excludable from gross income, such Net Tax Benefits shall be debited to Special Reserve Account I or, if this Agreement has terminated, paid to the ACQUIRING ASSOCIATION.

9. The correspondence was between Tim Dickens, a Senior Tax Accountant with the FDIC, and Dan Powers, Local's Chief Financial Officer. That correspondence includes: Local section 9 computations (Apr. 15, 1994) (from Mark Wood to Mr. Powers, recording set-off of $8.4 million in CAL losses pursuant to section 9); correspondence of May 23, 1994 from Mr. Dickens, FDIC, to Mr. Powers, Local ("[T]he primary differences between our calculations of tax benefits and that of Local America's are that ... your calculation considers the deductions taken by the Revenue Act of 1993 as tax detriments."); unsigned letter of June 23, 1994 from Mr. Powers, Local to Mr. Dickens, FDIC ("[A]s a result of this change in the tax laws, Local America is entitled to make a debit entry in Special Reserve Account I under provision 9(f) of the Assistance Agreement."); letter from Mr. Dickens to Mr. Powers (July 22, 1994) (disagreeing with Local's position on section 9(f)); letter from Mr. Dickens to Mr. Powers (Nov. 10, 1994) ("[W]e feel we have an adequate explanation of your position on the tax issues."). Mr. Powers contended that debits to the Special Reserve Account constituted payment of Local's tax sharing obligations because net tax benefits were paid through debits and credits to the account.

condition. It sought unspecified damages, costs, and interest. On January 1, 1997, defendant counterclaimed, asserting a breach of the Assistance Agreement and seeking $19,558,758.00 from Local in withheld tax sharing payments, plus accrued interest.

Local and the FDIC litigated over the proper interpretation of the tax sharing provisions of the Assistance Agreement until December 20, 2002, when they entered into a Termination Agreement. The Termination Agreement ended the Assistance Agreement and settled the defendant's outstanding counterclaims for unpaid tax benefit payments. Section 8.3(a) of the Termination Agreement also provided that Local waived any right to claim more than 50% of the tax benefits attributable to CALs.

Before the court on this motion for summary judgment is the issue of damages. Plaintiff's prayer for damages can be divided into four categories. Local first alleges that it is entitled to $4,503,296 as compensation for its share of the additional taxes it incurred due to the Guarini legislation. Second, plaintiff requests $2,424,852 in anticipation of the recovery year tax burden, in the event that recovery will itself be subject to tax. Third, Local seeks a refund of $2,228,-551,which represents a portion of the prejudgment interest that it paid to settle defendant's counterclaims (referred to herein as the "interest offset"). Fourth, in the alternative to its interest offset claim, Local seeks borrowing costs of $822,352 arising from its status as a net borrower of funds during the periods relevant to this case.

The first item of damages plaintiff is attempting to recover, Local's share of the additional federal and local taxes it paid because of defendant's breach of the Assistance Agreement, it calculates to be $4,503,296. Using a "with and without" methodology, plaintiff's expert Mark Wood[10] calculated that defendant's breach caused Local to pay $9,006,592[11] in additional taxes. The with and without method compares plaintiff's tax liability with the CAL deduction and absent the deduction. The same methodology was approved in *Centex v. United States*, 55 Fed. Cl. 381 (2003),[12] to calculate the loss of CAL tax benefits. It is not disputed that Local paid an additional $9,006,592 as a consequence of the enactment of section 13224 of the Guarini legislation. In light of the Termination Agreement,[13] plaintiff seeks 50% of that amount, $4,503,296.[14]

Plaintiff also alleges that any recovery in this matter will be taxable. Local's second element of damages is thus $2,424,852[15] to "gross-up" the claim to cover the anticipated recovery year tax burden. Defendant argues that the gross-up claim fails as a matter of law. Both parties agree that this issue cannot be distinguished from, and is governed by, the court's holding in *Centex IV*, where the court rejected such a claim. Although we agreed with plaintiff in *Centex IV* that enactment of the Guarini legislation caused them to suffer damages for the loss of CAL

**10.** Mark Wood, C.P.A., the lead partner in Ernst & Young LLP's Oklahoma City tax practice.

**11.** Presented in report of plaintiff's expert, Mark A. Wood, July 31, 2002.

**12.** There were four relevant Centex decisions: *Centex Corp. v. United States*, 48 Fed.Cl. 625 (2001) ("*Centex I*"); *Centex Corp. v. United States*, 49 Fed.Cl. 691 (2001) ("*Centex II*"); *Centex Corp. v. United States*, 52 Fed.Cl. 599 (2002) ("*Centex III*"); *Centex Corp. v. United States*, 55 Fed.Cl. 381 (2003) ("*Centex IV*").

**13.** The Termination Agreement, entered into on December 30, 2002, settled defendant's outstanding counterclaims for unpaid tax benefit payments. The Termination Agreement provided at section 8.3(a) that Local waived any right to claim more than 50% of the tax benefits attributable to CAL.

**14.** Defendant originally asserted, but has since withdrawn the argument, that plaintiff erroneously calculated the quantum of damages sustained by Local resulting in an overstatement of damages in the amount of $35,000. Defendant will not dispute the $4,503,296 quantum figure arrived at using the "with and without" methodology. Defendant still continues to assert that plaintiff has failed to establish causation, however.

**15.** This amount was derived by multiplying the $4,849,703 federal recovery year taxes in the Wood damage report by 50% to reflect the terms of the tax benefits sharing provisions of the Assistance Agreement.

deductions, we rejected the argument that any recovery would be taxable.

Third, Local seeks $2,228,551 to recoup funds paid to defendant in settlement of its counterclaims. Local characterizes this as an interest offset to recover a portion of the prejudgment interest that it paid, pursuant to the Termination Agreement. Plaintiff calculates the amount by offsetting any Guarini damages awarded to Local *nunc pro tunc* against the principal amount paid to settle defendant's counterclaim and then recalculating the prejudgment interest portion of the settlement.

It is not disputed that the government, unlike plaintiff, is entitled to collect prejudgment interest on its claims. Specifically, Local paid $24,660,404 to the FDIC pursuant to the Termination Agreement, of which $7,718,893 [16] represented prejudgment interest. Local proposes to offset the $4,503,296 anticipated as return of taxes paid against the $20,047,249 principal amount paid to the FDIC under the Termination Agreement. Under plaintiff's method of calculating the offset, it would be entitled to a return of $2,228,551. [17] The parties acknowledge that plaintiff's right to pursue the interest offset claim was preserved by the Termination Agreement, as was defendant's right to challenge the claim. [18]

16. The amount paid in settlement of defendant's counterclaim was calculated by defendant's accounting expert, Mr. Lars Viitala. He is a C.P.A. formerly of Berry, Dunn, McNeil & Parker in Portland, Maine. After December 2001 he has operated a solo tax practice. Mr. Viitala computed the prejudgment interest on the entire claim owed the FDIC under the assistance agreement and did not include any set-off against the principal amount for plaintiff's injury suffered due to the Guarini legislation.

17. Interest on the past due unpaid tax benefits owed to defendant accrued from the time payment was withheld until the settlement was reached. The settlement payment was calculated as follows: $20,047,249 in unpaid tax benefits, plus interest of $7,718,893, less $3,105,738 already collected by the FDIC, for a net settlement payment to the FDIC of $24,660,404.

18. Section 8.3(b)(ii)-(iii) of the Termination Agreement provides that:

(ii) *Reservation of Rights of [Local].* Notwithstanding anything contained in this Agreement,

The following facts concerning the amount and timing of tax payments are not in dispute. Local experienced NOLs of $33.7 million in tax year 1997, and $77.1 million in tax year 1998. Therefore, Local filed amended tax returns carrying back the 1997 loss into 1994 resulting in additional tax refunds. This lowered Local's tax liability for 1994 from $12.4 million to $4.5 million. Local again filed amended returns resulting in partial tax refunds in 1998 and 1999 when it claimed NOLs carrybacks. Starting with the taxable year ending June 30, 1999, Local again experienced profits and paid taxes associated with those profits. Local contends that by the time it paid taxes for the tax year ending December 31, 2001, it had repaid all the refunded Guarini taxes.

Even assuming plaintiff's entitlement to an interest offset, the parties dispute the proper methodology to be employed in calculating it. Local contends that the bank began accruing Guarini damages immediately on August 9, 1993, when the legislation was enacted. It is not in dispute that the government's counterclaim began accruing interest from the date Local began withholding tax sharing payments. Because the date of the Guarini legislation is earlier than the date when the first tax benefit sharing payment was withheld, plaintiff contends that interest on the first

[Local] shall be entitled to include in the calculation of its damages related to the [CAL] Claims an amount, referred to as the "Interest Offset Claim," composed of the difference between (a) the Interest Component being paid pursuant to this Agreement and (b) the amount of interest that [Local] would have owed under the Assistance Agreement (using the interest rates and methodologies set out in the Expert Report) had the principal amounts on which such Interest Component was computed been reduced by the quantum of injury allegedly caused to [Local] by § 13224 [the Guarini legislation]. Nothing in this Agreement shall constitute a waiver, satisfaction, or settlement of the Interest Offset Claim.

(iii) *Reservation of Rights of the United States.* The United States retains all its rights and defenses it might otherwise have against the Interest Offset Claim, including but not limited to the right to assert that the Interest Offset Claim is not permissible because it constitutes prejudgment interest, and the right to assert the Interest Offset Claim should be computed in a manner other than the manner in which [Local] has computed it.

$4.5 million of defendant's counterclaim would never have accrued. Accordingly, plaintiff argues that the actual timing of Local's additional tax payments and refunds can be ignored. Rather, it contends that the proper methodology for recalculating the prejudgment interest paid by Local is to offset CAL damages against the earliest tax sharing payments. Based on this approach, Local's Vice President and Investment Manager, Greg Juedeman, computed the interest offset by applying the $4.5 million in breach damages against the earliest principal payments due to the FDIC under the settlement.[19] He determined that the amount plaintiff should recoup is $2,228,551. Defendant disputes both the legal and factual basis of this methodology but concedes that if these CAL damages are offset against the earliest withheld tax sharing payments, then Mr. Juedeman's calculation is correct.

Defendant, while not conceding that interest offset damages are available to Local, argues that in calculating such an offset the court must take into account the actual amount and timing of the required tax payments. Defendant contends that the interest offset only applies on the running balance between additional tax payment, tax refunds, and withheld tax benefit sharing payments. Defendant therefore argues that the court cannot rely on Mr. Juedeman's calculations because they ignore the actual timing of purported tax payments. Dr. Jonathan A. Neuberger,[20] another of defendant's experts, offers alternative computations of interest offset damages in which he contends that plaintiff's damages were incurred over time and at later dates. Dr. Neuberger did not, however, investigate the actual timing of the tax overpayments and refunds prior to performing his interest offset calculations.

The parties also dispute the facts underlying the actual timing and amount of tax payments and refunds. Defendant contends

that the additional taxes paid by Local because of the Guarini legislation occurred well after the bulk of the tax sharing payments already had accrued. Specifically, defendant contends that Local's additional tax payments due to the Guarini legislation were $1.5 million on March 15, 1994, $6.2 million on March 15, 1995, and $9.8 million on June 17, 1996. In contrast, Local contends that it paid $4.3 million in additional taxes on April 14, 1994, the date Local first withheld tax benefit payments from the FDIC, and had paid more than $9 million in additional taxes by April 14, 1995, the date of Local's second withholding of benefits payments. Additionally, defendant claims that Local should account for a tax refund it received of $3.2 million.

There is also a factual dispute over the proper source of the data for the timing of tax payments, tax refunds, and interest rates. Defendant contends that its expert, Dr. Neuberger, relied on the dates, interest rates, and amounts of overpayments in Lars Viitala's expert report. Plaintiff claims that Dr. Neuberger's calculations are erroneous because they rely on a summary from the report of plaintiff's expert, Mr. Wood, that does not present the actual timing of Local's payments of Guarini taxes. Furthermore, plaintiff contends that Dr. Neuberger used interest rates for calculating the offset that were not contained in Mr. Vittala's report.

Dr. Neuberger contends that the starting point for computation of interest should be "the date on which the party entitled to the interest was legally entitled to collect the debt." Neuberger Dep. 26—27. Therefore, defendant contends that the maximum amount of interest offset incurred by Local is $1,385,033. However, at oral argument on November 5, 2003, defendant referred the court to Table 2. Table 2 is contained in the appendix to defendant's reply brief at page

19. Declaration of Mr. Juedeman ( Jan. 21, 2003). Mr Juedeman set-off approximately $2.4 million in Guarini damages against the first $2.4 million withheld from the FDIC on April 14, 1994. The remaining balance of approximately $2.1 million was set-off against the amount withheld from the FDIC on April 14, 1995. The portion of the prejudgment interest that the government collected on these amounts was then calculated and

subtracted from the prejudgment interest that the government collected on its counterclaim as part of the Termination Agreement.

20. Jonathan A. Neuberger, Ph.D., Vice President in economic consulting for Economics Incorporated, received his Ph.D. in economics from John Hopkins University

1654, and is a revised interest offset calculation using Mr. Viitala's methodology, which concludes that the maximum amount of interest offset available to Local was $1,330,000.[21] Plaintiff asserts that if the court agrees with defendant that the timing of the actual payments and refunds is relevant, then the correct amount of interest offset damages is $1,445,839. This amount is based on a recomputation conducted by plaintiff's counsel prior to Dr. Neuberger's deposition.

The fourth category of damages Local seeks consists of borrowing costs of $822,352 arising from its status as a net borrower of funds. This claim is in the alternative to its interest offset claim. Plaintiff has presented no evidence that additional funds were specifically borrowed to finance the additional taxes, although both parties agree that during all relevant times Local was a net borrower of funds. Plaintiff contends that this establishes that any additional tax liability would, therefore, have required it to borrow money in order to make tax payments. Defendant contends, however, that the evidence also establishes that at all relevant times Local had ample cash flows and other sources of funds to make tax payments. Both parties concede that Local's borrowing cost claim is indistinguishable from a similar claim resolved in *Centex IV*.

## DISCUSSION

The first item of damages Local seeks is $4,503,296 in lost CAL tax benefits. This figure was prepared by plaintiff's expert, Mr. Wood, who compared the tax liability of plaintiff with and without the deduction. This methodology is the same as that accepted by the court in *Centex IV*. Defendant has withdrawn any objection to the use of this figure. The court thus concludes that Local paid an additional $9,006,592 in federal and local taxes. By the terms of the Termination Agreement, Local is only entitled to claim 50% of the additional taxes as damages, for a total of $4,503,296.

The government renews, however, its argument that the CAL tax deduction might have been disallowed by the I.R.S. In *Centex I*, we held that the CAL tax deduction was available prior to the enactment of the Guarini legislation. *Centex I*, 48 Fed.Cl. at 634–36. Defendant acknowledges that it cannot distinguish the facts of this case from *Centex*, but wishes to preserve the issue for appeal. Accordingly, plaintiff is entitled to recover $4,503,296 as damages for the loss of the CAL deduction.

Second, plaintiff seeks $2,424,852 to reimburse it for taxes it anticipates paying on the principal award. Relying on IRS private letter rulings, it argues that the IRS's administrative position places it in danger of being subject to additional tax based on the court's award of damages.[22] Such a "gross-up" might be appropriate if the award will be treated by the IRS as taxable income. *Centex IV*, 55 Fed.Cl. at 388. In that event, the court could adjust a damages award to offset foreseeable tax implications. *Id.* (discussing *Oddi v. Ayco Corp.*, 947 F.2d 257, 267–68 (7th Cir.1991); *Beggs v. Dougherty Overseas, Inc.*, 287 F.2d 80 (2d Cir.1961)).

Plaintiff has the burden of establishing that the award is taxable. *See LaSalle Talman Bank F.S.B. v. United States*, 45 Fed. Cl. 64, 110 (1999). It concedes, however, that the present facts are not distinguishable from *Centex IV*, where this court held that the award of damages for the government's breach in enacting the Guarini legislation would not constitute taxable income. *Centex IV*, 55 Fed.Cl. at 388 (relying upon *Clark v. Commissioner*, 40 B.T.A. 333, 1939 WL 11 (1939); *Rev. Rul. 57–47*, 1957–1 C.B. 3, 1957 WL 11946 (1957)); *see United States v. Kai-*

---

**21.** Plaintiff disputes defendant's use of this document and moves that its conclusions should be disregarded pursuant to RCFC 37(c)(1). *See infra* n. 25.

**22.** Plaintiff relies on Private Letter Ruling 9226033, 1992 WL 808824 (June 26, 1992); Private Letter Ruling 9728052 (Apr. 16, 1997); Private Letter Ruling 9743034 (July 28, 1997); Private Letter Ruling 9743035 (July 28, 1997);

Private Letter Ruling 9833007, 1998 WL 473910 (Aug. 14, 1998). It is well established that private letter rulings while informative are not precedent and can not bind this court. *See Hanover Bank v. Commissioner*, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962); *Snap–On Tools, Inc. v. United States*, 26 Cl.Ct. 1045, 1060 (1992), *aff'd*, 26 F.3d 137 (Fed.Cir. 1994).

*ser,* 363 U.S. 299, 311, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960). Summary judgment for the defendant is thus appropriate on the issue of tax gross-up.

Third, Local seeks $2,228,551 as the return of interest it says should not have been paid pursuant to the Termination Agreement to settle the defendant's counterclaims. Plaintiff argues that, if its principal recovery here is appropriately offset against defendant's counterclaim, a portion of interest would be eliminated. According to plaintiff this offset would then reduce a portion of the $7,718,893 prejudgment interest payment Local made to the FDIC pursuant to the Termination Agreement.

■ As a threshold matter, we note that plaintiff's claim for an interest offset was preserved by the reservation of rights clause in the Termination Agreement. We note, moreover, that the common law right to set-off is not surrendered absent specific language. *Applied Companies v. United States,* 144 F.3d 1470, 1475 (Fed.Cir.1998).

■ The right to common law set-off allows "every creditor, to apply the appropriated moneys of his debtor, in his hands, in extinguishment of the debts due him." *Boers v. United States,* 44 Fed.Cl. 725, 733 (1999); *Mazama Timber Products v. United States,* 6 Cl.Ct. 87, 88–89 (1984) (quoting *United States v. Munsey Trust,* 332 U.S. 234, 239, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947)). It has long been the rule that the government can exercise set-off against its contractors. *Munsey Trust,* 332 U.S. at 239, 67 S.Ct. 1599; *Spodek v. United States,* 46 Fed.Cl. 819, 826–27 (2000) (Postal Service retains set-off right absent explicit statutory or contractual provision). This court recognizes the right of private entities to exercise the common law right of set-off against the United States. *Mazama,* 6 Cl.Ct. at 88–89 (it was proper for plaintiff to withhold payments owed the Forest Service as a set-off

against amounts due from the agency). In *Mazama,* the court held that "[o]ffsets are available to any debtor/contractor who also acts as a creditor. This includes the government, a private contractor, and a public contractor." *Id.*

■ A valid set-off requires "(i) a decision to effectuate a set-off, (ii) some action accomplishing the set-off, and (iii) a recording of the set-off." *Applied Companies v. United States,* 144 F.3d 1470, 1474 (Fed.Cir.1998) (quoting *Citizens Bank v. Strumpf,* 516 U.S. 16, 19, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995)). The decision to effect a set-off must demonstrate "an intent permanently to settle accounts." *Citizens Bank,* 516 U.S. at 19, 116 S.Ct. 286. In the present case, evidence of Local's intent is provided by correspondence between Dan Powers, Local's Chief Financial Officer, and Mr. Dickens of the FDIC.[23] It is evident from the correspondence that, as early as 1994, Local intended to make debits to its account with the FDIC to permit it to recoup the lost CAL deductions. The evidence presented establishes that Local decided to recoup the loss by setting it off against the other sharing payments due and payable to the FDIC, that Local did in fact withhold the tax sharing payments due the FDIC, and that Local debited the Special Reserve Account in order to accomplish the set-off. The uncontroverted evidence thus establishes that Local satisfied all three elements of common law set-off.

Defendant contends that even if Local did attempt to effectuate a set-off, what Local did here cannot be validly characterized as a set-off. Defendant argues that withholding monies due the FDIC as a set-off was not proper because the amount of set-off must be "demandable" when the original claim comes due and the offset must be determinable at the date of offset. *See Giant Food, Inc. v. Jack I Bender & Sons,* 399 A.2d 1293 (D.C.

**23.** The government has not challenged Local's factual assertion that it intended to set-off the CAL deductions lost due to the Guarini legislation against the tax benefit sharing payments due to the FDIC. Defendant has objected to the introduction at summary judgment of the unsigned letter of June 23, 1994 from Mr. Powers, Local to Mr. Dickens, FDIC claiming that Local is entitled

to make a debit entry in Special Reserve Account I under provision 9(f) of the Assistance Agreement. From the record before the court it is acknowledged that the FDIC received this correspondence and responded to it. The absence of signed originals does not raise a dispute over a genuine issue of material fact.

1979); *Burgermeister Brewing Corp. v. Bowman,* 227 Cal.App.2d 274, 38 Cal.Rptr. 597 (1964).

■ Defendant argues that Local could not have known the extent of the impact of the Guarini legislation when it withheld the tax benefit payments. Damages were dependent upon future earnings which plaintiff could not have known at that time. We disagree. Local correctly points out that a claim need not be reduced to a judgment before set-off is available. Rather, set-off can be applied pending resolution of the issue. *Mega Construction Co. v. United States,* 29 Fed.Cl. 396, 445 (1993); *Mazama,* 6 Cl.Ct. at 89. Local was legally entitled to recover the CAL damages caused by defendant's breach at the time that they began to accrue. While Local could not have known the extent of CAL damages with certainty—they were dependent on other taxable events, such as the carrybacks of operating losses from 1997 and 1998—using the with and without methodology, Local was capable of calculating a presumptive amount of disallowed CAL tax deductions at any given moment. The existence of an unliquidated set-off, while making the amount of the claim uncertain, does not invalidate the offset, so long as the claims at issue arose out of the same contract or transaction. *See Fluor Corp., Ltd. v. United States ex rel. Mosher Steel Co.,* 405 F.2d 823, 830 (9th Cir.1969).

■ The present set-off claim is clearly based on Local's good faith belief that it had a valid claim and was due compensation for the loss of the CAL tax deductions. We conclude Local had the right to assert set-off.

The precise method of calculating the set-off is more complicated. When, as in the present case, one party has a liquidated claim subject to prejudgment interest, and the other party has an unliquidated set-off, not subject to prejudgment interest, the rule on calculating prejudgment interest depends on whether the claims are related. *Fluor Corp.,* 405 F.2d at 830. The courts have traditionally employed one of four possible approaches: conversion of the liquidated claim, counterclaim as a discount, interest on the entire claim, and interest on the balance. *Ralston Purina Co. v. Parsons Feed & Farm Supply,*

*Inc.,* 416 F.2d 207, 212 (8th Cir.1969); *Socony Mobil Oil Co. v. Fremont Contractors, Inc.,* 205 F.Supp. 388, 390–91 (D.Neb.1962).

The first method, "conversion of the liquidated claim," applies in those situations where the liquidated claim is subject to reduction by an unliquidated claim, and, therefore, is said to be itself rendered uncertain or unliquidated by the set-off, resulting in interest not being recoverable on the formally liquidated claim. *Socony Mobil,* 205 F.Supp. at 390–91. In the present case, where Local challenges the proper amount of interest it has already paid but does not raise a legal challenge to the government's right to collect prejudgment interest, "conversion of the liquidated claim" is inapplicable.

The "counterclaim as a discount" approach results in the party with the liquidated claim collecting interest on the entire claim. It is applicable when the set-off is not assertable at the time of the liquidated claim, but only arises at some later date. It therefore acts only to discount the total amount due after interest is awarded on the liquidated claim. This approach is clearly inapplicable to the present situation because the breach occurred prior to plaintiff's withholding of the set-off. Local was legally entitled to seek compensation for CAL damages as they accrued. Because the tax events that created defendant's counterclaim occurred contemporaneously with the events that caused Local's CAL damages, the "counterclaim as a discount" approach is inapplicable.

The "interest on the entire claim" approach awards the party with the liquidated claim interest on the entire amount of its claim prior to any set-off. *Socony Mobil,* 205 F.Supp. at 390–91. It is generally employed only if the unliquidated claim arose from an unrelated transaction. *Ralston Purina,* 416 F.2d at 212.

When, as in the present case, both claims arise out of related transactions, courts employ the "interest on the balance" rule. Prejudgment interest is available only on the net difference between the two claims at any point in time. *Id.* The amount of the counterclaim is set-off against the liquidated claim and the interest is paid on the balance

due after deducting the set-off. *Id.* The objective of the rule is to compensate for the loss of the use of "money only to the extent of the difference between the two claims." *Id.*

This case is similar to *Ralston* in that throughout the time that Local withheld tax sharing payments, both FDIC and Local were each obligated to the other. The FDIC was deprived of the use of its funds only to the extent there was a difference between the two amounts. The better rule here, therefore, is to calculate the prejudgment interest due on the balance after subtracting the set-off, not on the entire claim. *Fluor Corp.*, 405 F.2d at 830. We hold that the "interest on the balance method" is applicable to the present case.

Defendant raises an additional legal defense to Local's interest offset claim, namely, that it is prohibited by the "no interest rule." *See* 28 U.S.C. § 2516(a) (2003) ("[I]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.") Defendant contends that the offset claim is merely prejudgment interest in disguise. *See Library of Congress v. Shaw*, 478 U.S. 310, 317, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (changing nomenclature of prejudgment interest does not bypass the "no-interest" rule).

We disagree. Plaintiff is not seeking prejudgment interest on the $4.5 million in CAL damages it incurred. Rather, Local is seeking to avoid paying interest to the government or, more accurately, it is seeking the return of money paid to the government as interest.

■ Defendant argues, however, that having already paid the interest, Local is not entitled to its return. *Doty v. United States*, 109 F.3d 746, 748–49 (1997), recognized the proposition that where a party was made to pay a disputed amount, as well as interest on that amount, it may recover both principal and interest. *Id.* The court held that the government has no right to retain interest it improperly collected. *Id.; see also Kimco Realty v. United States*, 51 Fed.Cl. 257, 264 (2001); *Overton v. United States*, 28 Fed.Cl.

812, 817 (1993). Local correctly contends that it was similarly improper for the FDIC to retain interest on the entire counterclaim without setting off the damages suffered by Local as a result of the Guarini legislation. Absent the Termination Agreement, Local would have been liable for prejudgment interest only on the balance of the difference between the counterclaim and Local's claim, rather than the entire counterclaim. By characterizing the return of the excess prejudgment interest that Local already has paid as an award of prejudgment interest, defendant is urging the court, in effect, to adopt the "interest on the entire claim" methodology, a minority view. *See Ralston Purina*, 416 F.2d at 210. The majority view is that where the claims are related, interest is calculated on the difference between the two claims. *Id.; Fluor Corp.*, 405 F.2d 823. We conclude that Local is entitled to the return of monies paid unnecessarily.

Local contends that it began to suffer damages when the Guarini legislation was enacted in August 1993. Therefore, Local seeks to set off the full $4.5 million in CAL damages against the government's counterclaims at the earliest possible dates in 1994 and 1995. In effect, it is asking that we ignore the actual timing of additional tax payments and refunds incurred by Local. Greg Juedeman calculated the amount of interest offset damages by offsetting the earliest tax benefit payments that were due to the FDIC. If the court adopted this methodology, both parties agree that Local would be entitled to recover $2,228,551. We decline to use it, however, because it does not take into account when Local actually paid the additional taxes. It has the effect of artificially inflating the quantum of prejudgment interest to be refunded to Local.

Local is entitled only to those damages actually incurred due to the defendant's breach. *Westfed Holdings, Inc. v. U.S.*, 52 Fed.Cl. 135, 164 (2002) (holding that plaintiff could not recover interest assessed on it but never paid; it could only recover those amounts it actually expended). Defendant argues correctly that the court must consider the actual timing of plaintiff's tax payments in order to correctly calculate damages. We

therefore reject plaintiff's calculation. The parties must take into account the actual timing of tax payments and refund payments in calculating any interest offset claim.

The present state of the briefing does not permit us to make that determination, however, because, with respect to the amount and timing of actual tax payments and tax refunds, the parties disagree as to the facts. Defendant initially advanced a calculation of $1,385,033 [24] for interest offset damages. Relying on a document entitled, "Revised Interest Offset Calculations," based on Mr. Viitala's methodology, it now advances a recalculation of $1,330,000.[25] Plaintiff, relying on an unsponsored recalculation first presented at Dr. Neuberger's deposition on August 8, 2003, contends that, if timing of payments is important, the correct amount of interest offset is $1,445,839.[26]

To the extent the parties disagree upon genuine issues of material fact, we cannot resolve the interest offset issue on summary judgment. Summary judgment is thus denied both parties with respect to the quantity of interest offset.

■ The final element of damages is plaintiff's alternative claim for borrowing costs of $822,352. This arises from Local's status as a net borrower of funds during all times relevant to the breach. Plaintiff contends that, because of the breach, it needed to borrow funds in order to pay the additional taxes. There is no contract or statutory language providing for the award of interest, however. Moreover, plaintiff offers no specific evidence that funds were borrowed to pay taxes during the term of the breach. Nor is there evidence before the court that an award of borrowing costs was contemplated by the parties. While it has been held that foreseeable financing costs resulting from breach can be recovered because they are interest as a claim rather than interest

on a claim, plaintiff has failed to establish proof it has met the standard of foreseeability and causation required for recovery. *Centex IV*, 55 Fed.Cl. at 390 (relying on *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1354–58 (Fed.Cir.2001)). In addition, plaintiff acknowledges that this claim cannot be distinguished from *Centex IV* and is governed by this court's rejection of that claim there. *Id.*[27] The borrowing cost claim is therefore denied.

## CONCLUSION

Both parties' motions for summary judgment are granted in part and denied in part. Local is awarded $4,503,296 in damages to compensate it for the government's breach of contract in revoking the agreement to provide CAL tax benefits. Plaintiff's request to recover a tax gross-up is rejected, as is its claim for borrowing costs. Plaintiff's motion for summary judgment on interest offset is, for the present, denied. Defendant's cross-motion for summary judgment on interest offset is denied. The parties are directed to file a joint status report with a proposed schedule for further proceedings by March 30, 2004.

24. Supplemental Report of Dr. Neuberger, July 21, 2003. Def.App. 1535–49.

25. Revised Interest Offset Calculations. Def. App. 1654. This document is subject to plaintiff's motion to strike under RCFC 37. Because genuine issues of material fact remain unresolved, the motion is denied as moot.

26. Neuberger Dep. Ex. 6.

27. We note, in any event, that plaintiff concedes that this claim is "mutually inconsistent" as well as "duplicative of the interest offset" claim. We allowed that claim above. The borrowing cost claim is therefore redundant.