# United States Court of Appeals for the Federal Circuit

04-5106, -5107

LOCAL OKLAHOMA BANK, N.A.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Kent A. Yalowitz, Arnold & Porter LLP, of New York, New York, argued for plaintiff-cross appellant. With him on the brief were Melvin C. Garbow, Howard N. Cayne, and Thomas R. Dwyer, of Washington, DC.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; and Jeanne E. Davidson, Deputy Director.

Appealed from: United States Court of Federal Claims

Senior Judge Eric Bruggink

# United States Court of Appeals for the Federal Circuit

04-5106,-5107

LOCAL OKLAHOMA BANK, N.A.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  June 29, 2006

_____

Before MICHEL, <u>Chief Judge</u>, LOURIE and LINN, <u>Circuit Judges</u>.

LINN, <u>Circuit Judge</u>.

The United States appeals from the summary judgment of the United States Court of Federal Claims, holding that the United States breached the implied covenant of good faith and fair dealing, <u>Local America Bank of Tulsa v. United States</u>, 52 Fed. Cl. 184 (2002) ("<u>Local I</u>"), and awarding $5,833,296 in damages to Local Oklahoma Bank ("Local"), <u>Local Oklahoma Bank, N.A. v. United States</u>, 59 Fed. Cl. 713 (2004) ("<u>Local II</u>").  Local cross-appeals from calculation of the damage award.  Because the trial court properly determined liability and damages, we affirm.

BACKGROUND

The facts of this case are similar to a line of cases arising out of the savings and loan crises of the 1980s and the consequent regulations adopted by the government and summarized in United States v. Winstar Corp., 518 U.S. 839 (1996). Common to all of these so-called "Winstar" cases is a contractual relationship between the bank and the United States and an allegation by the complaining bank that the United States breached its contractual obligations to the bank when Congress enacted certain tax legislation in 1993. See, e.g., Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005); First Heights Bank, FSB v. United States, 422 F.3d 1311 (Fed. Cir. 2005); First Nationwide Bank v. United States, 431 F.3d 1342 (Fed. Cir. 2005). The contractual relationship between the parties in this case began when Local responded to a request, put out by the Federal Savings and Loan Insurance Corporation ("FSLIC"), for proposals to acquire a failing thrift in exchange for, inter alia, certain tax benefits. On December 29, 1988, the parties negotiated an Assistance Agreement, wherein Local agreed to acquire a failing thrift in exchange, in part, for the opportunity to claim covered asset loss tax deductions. The Assistance Agreement provided for a sharing of the covered asset loss tax deductions and other tax benefits between Local and the FSLIC, and required Local to make sharing payments to FSLIC thirty days after Local filed its yearly tax returns. During negotiations, Local sought, but did not receive, several indemnifications, including one for "any change in the federal laws or regulations after the date of this proposal [that] reduces the tax benefits arising from the acquisition."

On August 10, 1993, the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312, 485 (1993) (the "Guarini legislation"), was signed into law,

eliminating the favorable tax treatment for covered asset losses of acquired thrifts. Thereafter, on March 14, 1994, beginning with the first payment due after the Guarini legislation, Local stopped making tax sharing payments, taking the position that it was entitled to do so under Section 9(f) of the Assistance Agreement. Section 9(f) provides:

> Disallowed Deductions. In the event Net Tax benefits are paid with respect to Tax Benefit Items that are subsequently disallowed or that cease to be Tax Benefit Items because it is determined that payments with respect to such Tax Benefit Items are not to be excludable from gross income, such Net Tax Benefits shall be debited to Special Reserve Account I or, if this Agreement has terminated, paid to the Acquiring Association.

On September 17, 1996, Local filed a breach of contract action, alleging that the Guarini legislation breached the Assistance Agreement. The government counterclaimed, seeking recovery from Local of the withheld tax sharing payments, plus interest. On March 27, 2002, the Court of Federal Claims granted Local's motion for summary judgment on liability. The court based its decision on Centex Corp. v. United States, 49 Fed. Cl. 691 (2001), aff'd 395 F.3d 1283 (Fed. Cir. 2005), which held on "virtually identical facts" that the government breached an implied promise of good faith and fair dealing when Congress passed the Guarini legislation. Local I, 52 Fed. Cl. at 189-90. In granting Local's motion for summary judgment of liability, the court held that "the government violated an identical promise in this case." Id.

On December 20, 2002, Local and the government signed a Termination Agreement that terminated the Assistance Agreement and settled the government's counterclaims, but left unresolved Local's breach of contract claim. Under the settlement, Local was required to pay $24,660,404 in unpaid tax benefit sharing payments, of which $7,718,893 represented prejudgment interest. The parties

continued to litigate Local's breach of contract claim, in which Local sought to recover (1) $4,503,296 as compensation for its share of the additional taxes it incurred due to the Guarini legislation; (2) $2,424,852 in anticipation of the event that recovery will itself be subject to tax; and (3) either a refund of $2,228,551, representing a portion of the prejudgment interest that it paid to settle defendant's counterclaims (referred to herein as the "interest offset") or, in the alternative to the interest offset, borrowing costs of $822,352 arising from its status as a net borrower of funds during the periods relevant to this case.

On February 26, 2004, on cross-motions for summary judgment, the Court of Federal Claims awarded Local the $4,503,296 it sought as tax benefits lost as a result of the passage of the Guarini legislation. Local II, 59 Fed. Cl. at 723. Regarding the interest offset, the Court of Federal Claims agreed with Local that it should not have to pay interest on an amount that it did not owe the government and that, since the claims of the parties are related, Local was entitled to offset the interest that it overpaid the government. Id. The Court of Federal Claims agreed that Local's $4.5 million tax benefit award should be set-off against the principal amount it agreed to pay the government under the settlement agreement, and that the government is entitled to prejudgment interest on the net amount as opposed to receiving prejudgment interest on the full amount of the settlement. Id. at 719-23. However, the Court of Federal Claims declined to use Local's interest offset calculation methodology "because it [did] not take into account when Local actually paid the additional taxes" and had "the effect of artificially inflating the quantum of prejudgment interest to be refunded to Local." Id. at 723. The Court of Federal Claims rejected Local's methodology, which assumed that

Local was entitled to a return of money paid to the government as interest immediately after the breach, that is, beginning with the first sharing payment withheld after the Guarini legislation was enacted. Id. at 722-23. The Court of Federal Claims found that the proper methodology should take into account the actual timing of the tax payments because Local was "entitled only to those damages actually incurred due to the [government's] breach." Id. at 723. Because there were genuine issues of material fact as to the calculation of the interest offset amount, the court denied summary judgment on this issue. Id. at 724. The parties then stipulated that, if the actual timing of Local's tax payments was relevant, the accurate figure for the interest offset amount is $1,330,000. With the disputed factual issue stipulated out of the case, the Court of Federal Claims was then in a position to decide the case on summary judgment. On April 9, 2004, the Court of Federal Claims sided with Local and entered final judgment in its favor in the amount of $5,883,296.

The government appeals the Court of Federal Claims's summary judgment as to liability and interest offset, and Local cross-appeals the Court of Federal Claims's rejection of its methodology for calculating the interest offset award. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

ANALYSIS

A grant of summary judgment by the Court of Federal Claims is reviewed de novo. Cienega Gardens v. United States, 194 F.3d 1231, 1238 (Fed. Cir. 1998). Summary judgment is properly granted when, viewing the evidence in the light most favorable to the non-movant, the record indicates that there is "no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The general type of damages to be awarded, their appropriateness, and rates used to calculate damages are reviewed for clear error. <u>Home Sav. of Am. v. United States</u>, 399 F.3d 1341, 1347 (Fed. Cir. 2005). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States v. U.S. Gypsum</u>, 333 U.S. 364, 395 (1948). The abuse of discretion standard applies to decisions about the methodology used for calculating rates and amounts. <u>Home Savings</u>, 399 F.3d at 1347.

### 1. Liability

The government appeals from the judgment of liability, arguing that it is not liable because this court's decision in <u>Centex</u> was wrongly decided. We reject the government's misplaced argument that this court's decision in <u>Centex</u> was wrongly decided because we are bound to follow controlling precedent. <u>See</u> <u>First Heights</u>, 422 F.3d at 1314 (rejecting the same argument made by the government).

The government also attempts to distinguish <u>Centex</u> by arguing that, in this case, the parties were aware of—and addressed—the possibility that covered asset loss tax deductions may be eliminated. The government first asserts that section 9(f) of the Assistance Agreement shows evidence of such awareness because it provides an exclusive remedy, agreed upon by the parties, that is applicable when a Tax Benefit Item is disallowed. We find this argument to be without merit on the ground that section 25 of the Assistance Agreement clarifies that section 9(f) does not provide an exclusive

remedy. Section 25 of the Assistance Agreement provides that "[the rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law." See also First Heights, 422 F.3d at 1315 (construing virtually identical provisions and holding that the assistance agreement did not provide an exclusive remedy).

The government next argues that Local must have been aware that the tax laws might change because it sought, but did not receive, indemnification against changes in the tax laws. The government argues that the absence of an express indemnification clause shows that Local had a reasonable expectation that tax legislation might be enacted and that the trial court's liability ruling is therefore wrong. In Centex, the government made a similar argument, suggesting that "if the parties had wished to ensure against the risk of a change in the tax laws, they could have included a clause providing for the payment of damages in that event." 395 F.3d at 1306. We held that "[w]hile it is true that the parties could have included a clause specifically ensuring against legislation that destroyed the benefits of the contract, such covenants have not been required in the past to protect contracting parties against the risk of contract breaches by the government." Id. (citing Winstar, 518 U.S. at 887 (plurality opinion) ("no need for an unmistakably clear 'second promise'"); id. at 921 (Scalia, J, concurring in the judgment) (no requirement "that there be a further promise not to go back on the promise" that is the subject of the suit)). Applying these principles in this case, the government's suggestion that it was reserving for itself the right to alter the tax laws simply because it refused to indemnify Local does not persuade us that the absence of an express clause ensuring against changes in tax legislation should absolve the

government of liability. The government's refusal to indemnify Local did not eviscerate its implied promise to refrain from impairing performance of its contractual obligations. As we noted in Centex, "it would be inconsistent with the recognition of an implied covenant if we were to hold that the implied covenant of good faith and fair dealing could not be enforced in the absence of an express promise to pay damages in the event of conduct that would be contrary to the duty of good faith and fair dealing." Centex, 395 F.3d at 1306.

In sum, we find no error with the decision of the Court of Federal Claims that the language of section 9(f) and Local's requests for indemnification against changes in the tax law do not absolve the government of its contractual obligations. We have considered the government's remaining arguments regarding liability, and find them to be controlled by precedent. See id. at 1283; First Heights, 422 F.3d 1311 (issued after the government's main brief was filed but before the government's reply brief was filed); First Nationwide, 431 F.3d 1342 (issued after all briefs were filed). We therefore affirm the liability decision of the Court of Federal Claims.

### 2. Interest Offset

Both parties appeal from the interest offset award. The government first challenges the award of interest offset on sovereign immunity grounds, arguing that the award of interest offset damages effectively amounts to prejudgment interest on Local's $4.5 million award, from which the government is immune, citing United States v. Delaware Tribe of Indians, 427 F.2d 1218 (Ct. Cl. 1970). The Delaware Tribe court disapproved of an interest offset because, like interest, the offset in that case had the effect of compensating the Delaware Tribe of Indians for the lost time-value of money in

excess of what the tribe was entitled to receive. Id. at 1222-24. In this case, however, an offset of the government's prejudgment interest does not have the effect of providing Local with an excess amount above what it was entitled to receive; rather, the offset provides Local with the return of the excess money paid to the government as interest. Because the government was not properly owed $4.5 million of the principal amount Local agreed to pay the government under the settlement agreement, it should return to Local the interest charged on that amount. See Dotty v. United States, 109 F.3d 746, 748-49 (Fed. Cir. 1997) ("[S]ince [the plaintiffs] were entitled to the payments that were wrongfully retrieved by the government, the interest the government charged [the plaintiffs] for use of their own money should be returned."); see also Transmatic, Inc. v. Gulton Indus., Inc., 180 F.3d 1343, 1347 (Fed. Cir. 1999) ("[P]rejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed." (citation omitted)); Oiness v. Walgreen Co., 88 F.3d 1025, 1033 (Fed. Cir. 1996) (holding that prejudgment interest is compensatory, not punitive, and is intended to compensate the successful party for the use of its money).

The government also argues that it was erroneous for the Court of Federal Claims to award interest offset damages because the claims of the parties are not directly related. The government argues that the claims are not directly related in that Local's claim is premised upon lost tax benefits due to the Guarini legislation, whereas the government's counterclaim is premised on Local's failure to share the tax benefits that it did receive. Throughout the time that Local withheld tax sharing payments, both parties remained obligated to each other. But for the passage of the Guarini legislation, Local would not have withheld the tax payments. The direct result of the withholding,

triggered by the Guarini legislation, was that the government was deprived of the use of its funds. Where, as here, one party (i.e., the government) has a liquidated claim subject to prejudgment interest and the other party (i.e., Local) has a directly related unliquidated set-off not subject to prejudgment interest, prejudgment interest is available on the net difference between the government's claim and Local's set-off. See Giant Food, Inc. v. Jack I. Bender & Sons, 399 A.2d 1293 (D.C. 1979); Fluor Corp. v. United States, 405 F.2d 823, 830 (9th Cir. 1969) ("If, as in the present case, the unliquidated set-off or counterclaim constitutes a partial payment of the primary claim, interest is allowable on the balance due after deducting the amount of the set-off."); cf. Ralston Purina Co. v. Parsons Feed & Farm Supply, 416 F.2d 207 (8th Cir. 1969). We find no error in the trial court's determination that the claims are directly related and that the government was deprived only to the extent that there was a difference between the two amounts.

### 3. The Methodology

Turning to the methodology used to calculate the setoff amount, Local argues, on cross appeal, that the language of section 8.3(b)(ii) of the Termination Agreement precludes application of the government's calculation methodology and that the Court of Federal Claims abused its discretion in adopting that methodology. Section 8.3(b)(ii) (Reservation of Rights of Local) provides that Local reserves the right to have its interest offset claim calculated according to its methodology. However, according to section 8.3(b)(iii) of the Termination Agreement (Reservation of Rights of the government), the government reserved the "right to assert that the Interest Offset Claim should be computed in a manner other than the manner in which [Local] has computed

it." Because the government reserved the right to assert that its calculation methodology should be adopted, we reject Local's argument that the Termination Agreement precludes its application.

Local also contends that because it began to suffer damages when the Guarini legislation was enacted in August 1993 and that, because the date of the breach (i.e., enactment of the Guarini legislation) is earlier than the date when the first tax benefit sharing payment was withheld, the actual timing of Local's additional tax payments and refunds can be ignored. Local thus asks that we return to it the interest charged on the full $4.5 million as of the dates that it first withheld payments in 1994 and 1995. The appropriate focus is whether the offsetting claim could "be said to be demandable at the time when the original liquidated claim became due." Giant Food, 399 A.2d at 1302. We find no abuse of discretion with the decision made by the Court of Federal Claims that the calculation methodology for determining Local's damages must take into account the timing of Local's tax payments because, while it may be that the government was never properly owed the $4.5 million, Local is not entitled to damages based on costs it did not actually incur. See, e.g., Home Savings, 399 F.3d at 1353-55 (Fed. Cir. 2005) (affirming the trial court's damages award based on costs actually incurred); Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005) (same).

For the foregoing reasons, the judgment of the Court of Federal Claims is

AFFIRMED.

04-5106,-5107                                    11